# Illinois Official Reports

## Appellate Court

---

### *Advocate Financial Group v. Poulos*, 2014 IL App (2d) 130670

---

| | |
|---|---|
| Appellate Court Caption | ADVOCATE FINANCIAL GROUP, Plaintiff-Appellee, v. MICHAEL POULOS, OUR BILLING DEPARTMENT, INC., COMPUTER HEALTH NETWORK, INC., and TRELLIS HEALTH MANAGEMENT, LLC, Defendants-Appellants. |
| District & No. | Second District<br>Docket No. 2-13-0670 |
| Filed | March 31, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's order confirming an arbitration award for plaintiff based on the charges and attorney fees plaintiff incurred pursuant to an agreement plaintiff had with defendants was affirmed, notwithstanding defendants' failure to participate in the arbitration proceedings and defendants' contentions that the arbitrator exceeded his authority and that proper notice was not given, since defendants forfeited their arguments by failing to assert them in a timely manner. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 13-LM-336; the Hon. Robert G. Gibson, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Kevin Q. Butler, Cornelius E. McKnight, and Courtney A. Adair, all of McKnight, Kitzinger & Pravdic, LLC, of Chicago, for appellants.

Kevin M. Gallaher, of Brooks, Tarulis & Tibble, LLC, of Naperville, for appellee.

Panel

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices McLaren and Hudson concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendants, Michael Poulos, Our Billing Department, Inc., Computer Health Network, Inc., and Trellis Health Management, LLC, appeal the trial court's June 19, 2013, order confirming and entering an arbitration award in favor of plaintiff, Advocate Financial Group. Specifically, the arbitrator awarded plaintiff $17,561.66 for charges and attorney fees it incurred under an agreement it had with defendants. Defendants did not participate in the arbitration. Nevertheless, defendants argue on appeal that the trial court erred in confirming the award, and that we should vacate the order and enter judgment in their favor, because the arbitrator exceeded his authority where the contract between the parties had expired and did not provide for attorney fees. Further, defendants argue that they did not receive proper notice of the arbitration hearing. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND
¶ 3                                   A. The Agreement
¶ 4     On January 11, 2012, Poulos and Ronald G. Javorek (plaintiff's representative) executed an agreement in which plaintiff agreed to act as defendants' agent in attempting to negotiate alternative financing to avoid foreclosure. Defendants wished to depart from their existing relationship with BMO Harris Bank, N.A. The following five sections of the agreement are relevant to this appeal.

¶ 5     First, the agreement provides that plaintiff will assist defendants in obtaining a "Solution" to their situation, which is defined, in part, as: "the act, method, *or process* of solving a problem; the answer to a problem, explanation, clarification, relief (whether temporary or permanent), etc. [Plaintiff] will attempt to *prevent the further loss* of [defendants'] net worth/liquidity or to provide relief to circumstances ***." (Emphases added.)

¶ 6     Second, the "Charges" section of the agreement provides:

>     "Retainer: [Defendants] shall pay to [plaintiff] a Retainer in the amount of $2,000.00 [*sic*] as compensation for professional and administrative services in conjunction with the attempt to provide the Solution, paid in the following two

- 2 -

installments: The initial $2,000 portion of the Retainer is due upon the execution of this Working Agreement, and the second $2,000 payment is to be made upon successful refinance and departure from its current institution.

Solution fees: [Defendants] shall pay [plaintiff] the sum of 5% (less Retainer) of the amount of a Note Discount/Note relief at the time the Solution is complete. Since there is no certain loan amount to base a Solution fee, payment of this fee is at the discretion of [defendants].

3rd Party Fees: [Plaintiff] shall have the ability to earn any other fees associated with the Solution and paid to [plaintiff] from any 3rd Party. These fees are separate and independent of the Retainer and Solution fees.

Expenses: [Defendants] agree[ ] to pay all expenses of [plaintiff] that are/were directly attributable to the efforts of [plaintiff] in seeking a resolution (whether successful or not) or Solution. These expenses are not part of the Retainer or Solution Fees. All expense reimbursements are due upon demand. Expenses in excess of $150.00 needs [*sic*] [defendants'] approval.

[DEFENDANTS] ACKNOWLEDGE[ ] AND AGREE[ ] THAT [PLAINTIFF] SHALL BE PAID ALL FEES, CHARGES, AND EXPENSES ASSOCIATED WITH A SOLUTION PROVIDED BY [PLAINTIFF], [DEFENDANTS], OR ANY OTHER 3RD PARTY." (Emphasis in original.)

¶ 7    Third, the agreement specifies:

"DURATION: This Working Agreement is to be valid for a period of six-(6) months from the date of execution of this Working Agreement. Any Solution provided to [defendants] from [plaintiff] or any other Party will make the Charges due upon demand by [plaintiff]. Prior to 11:59 p.m., July 11, 2012, [plaintiff] may choose to extend the Working Agreement for a period of up to six-(6) months. This Working Agreement shall automatically terminate upon the Solution being provided to [defendants] and the payment of Charges. No Retainer will be due with an exercised extension."

¶ 8    Fourth, the agreement provides that defendants accepted certain responsibilities, including not making any other agreements without first notifying plaintiff and, if contacted by a lender, explaining to the lender that defendants had sought plaintiff's "consultation, advice and *loss mitigation* services." (Emphasis added.) Further, defendants were required, during the "*loss mitigation* process," to forward to plaintiff any correspondence received in connection with plaintiff's representation of defendants. (Emphasis added.)

¶ 9    Finally, the "Disclosure of Information" section at the end of the agreement notes, in part:

(1) "[Defendants] acknowledge[ ] and agree[ ] that [they] will be obligated to pay [plaintiff] the full amount due under this Working Agreement. All fees of amount owed, collection fees and court costs incurred in connection with such collection under this agreement will be given the highest priority under [defendants'] State of Residence laws."

(2) "To the fullest extent permitted by law, [defendants] shall pay all costs, *including reasonable attorney's fees*, court costs and collection costs without litigation or other formal proceedings, expended or incurred by [*sic*] in enforcing or defending any provision of this Working Agreement or any dispute arising from or related to this

Working Agreement if *Loss Mitigation* is the prevailing or successful party in such action(s)." (Emphases added.)

(3) "[Defendants] understand[ ] that any dispute over this Working Agreement shall be handled by a reasonable 3rd party to act as an intermediate [*sic*], arbitrator or negotiator. Any decision by this 3rd party is to be final and [defendants] and [plaintiff] waive any right to trial. Within 24 hours of official dispute notification, [defendants] and [plaintiff] must agree on a 3rd Party to rule on the dispute. If a reasonable 3rd Party cannot be agreed upon in the time frame specified, [plaintiff] has the right to chose [*sic*] the 3rd Party so long as [plaintiff] has delivered three potential candidates to act as the 3rd Party to resolve the dispute. [Defendants] and [plaintiff] shall bear the costs of the 3rd Party, equally."

¶ 10                                B. The Dispute

¶ 11    After the contract was executed, plaintiff received from defendants a check for the $2,000 initial retainer. The check was dated January 23, 2012. Plaintiff deposited the check on January 25, 2012.

¶ 12    On July 23, 2012, Javorek sent Poulos a letter, stating that the letter was to serve as official notice that, as of July 11, 2012, plaintiff had chosen to exercise its option under the agreement to extend "the Working Agreement executed on January 19th, 2012," for up to six months. Accordingly, the letter provided that "As of July 11, 2012, [plaintiff] is exercising this option and hereby extends the duration of the Working Agreement for six (6) months or until January 23rd, 2013."

¶ 13    On October 1, 2012, plaintiff sent Poulos a letter, congratulating him on his successful loan refinancing and departure from BMO Harris Bank and attaching an invoice in the amount of $13,281.66. The attached invoice lists the following charges and dates:

(1) March 31, 2012, "[Plaintiff] 3rd party Fees Earned–Diamond Bank Refinance," in the amount of $5,000;

(2) August 15, 2012, "[Plaintiff] 3rd party Fees Earned–Hettich Financing Solution/ SBA/Oceans Capital," in the amount of $6,250;

(3) October 1, 2012, "Initial Retainer Fee," in the amount of $2,000 (and reflecting that another $2,000 payment had been received); and

(4) October 1, 2012, "UPS Overnight Package," in the amount of $31.66.

¶ 14    In a letter also dated October 1, 2012, Poulos responded to the invoice, writing to Javorek that there was no successful loan-refinancing solution, that the agreement had ended on July 11, 2012, and was not properly extended, and that, therefore, "[y]our invoice dated October 1, 2012 from Advocate Financial Group is operating outside that agreement, and we consider these charges false and inaccurate and insist that you stop any further collection efforts." Finally, the letter notes that the agreement gives plaintiff the right to earn fees associated with the "solution" and paid to plaintiff "from any 3rd party." As such, Poulos concluded, "If those 3rd parties listed on the invoice made an agreement with you, I would suggest sending them your invoice as your agreement states. Since at no point in time did we approve these fees."

¶ 15    On October 4, 2012, plaintiff's counsel sent defendants a letter serving as an official dispute notification and identifying, pursuant to the agreement, three potential candidates to

resolve the dispute. The letter asked defendants to contact plaintiff to coordinate the selection of a third party.

¶ 16    Instead, however, on October 6, 2012, Poulos sent plaintiff a letter offering to settle the matter for $2,000 and directing all future communications to defendants' counsel, Harry S. Field.

¶ 17    On October 8, 2012, in a letter to defendants' counsel, plaintiff rejected that offer and, pursuant to the agreement, chose Edward R. Duncan, Jr., to serve as arbitrator.

¶ 18    On October 16, 2012, defendants' counsel replied that the contract between the parties expired on July 11, 2012, that the July 23, 2012, extension was ineffective, and:

> "Accordingly, there is no contract, and therefore, your client no longer has the right to demand any mediation, arbitration, etc. No financing solution was achieved during the period of this agreement, and therefore no fees are due your client. Additionally, *my client will not agree to participate in any arbitration/mediation proceeding.*" (Emphasis added.)

¶ 19    On October 24, 2012, plaintiff apparently sent defendants' counsel a letter reiterating that the agreement was extended, but noting that whether the agreement expired was a question of fact to be resolved through arbitration. It further noted that it had initiated the process for instituting arbitration and that Poulos had responded to that notification.

¶ 20    On November 5, 2012, however, defendants' counsel again wrote that the agreement had not been extended and that, because the agreement had expired, "the arbitration clause is not available, and *my client will not agree to any arbitration.* In that you have provided no evidence to support your propositions that there is a valid agreement, *my client or this office will not participate in any arbitration.*" (Emphases added.)

¶ 21                     C. Notices of Arbitration Hearing

¶ 22    The following four notices sent by plaintiff to defendants' counsel appear in the record. First, a November 28, 2012, "notice of arbitration hearing" sent by certified mail, return receipt requested, advised that the hearing would be held before Edward Duncan on December 5, 2012, at 10 a.m. The return receipt shows it was signed for by an "agent" at defense counsel's address on November 29, 2012.

¶ 23    Second, on December 3, 2012, plaintiff sent defendants' counsel a "notice of change of arbitration hearing," noting that the arbitrator had changed the time of the December 5, 2012, hearing from 10 a.m. to 9 a.m. Plaintiff sent the notification via Federal Express (FedEx) "standard overnight," and the tracking results list the package as having been delivered on December 4, 2012, at 10:45 a.m., and signed for by "receptionist/front desk" and, specifically, "M. Schaffner."

¶ 24    Third, the arbitration hearing began on December 5, 2012, but was continued. Accordingly, on December 14, 2012, via FedEx "standard overnight," plaintiff sent defense counsel a "notice of change of arbitration hearing," reflecting that the hearing was continued to 9 a.m. on December 18, 2012. The tracking results list the package as having been delivered on December 17, 2012, at 10:53 a.m., and signed for by "receptionist/front desk" and, specifically, "M. Atlas."

¶ 25    Fourth, the arbitration hearing was again continued. On December 20, 2012, via FedEx "standard overnight," plaintiff sent defense counsel a "notice of change of arbitration hearing,"

reflecting that the hearing was continued to 9 a.m. on December 27, 2012. The tracking results list the package as having been delivered on December 21, 2012, at 12:07 p.m., and signed for by "receptionist/front desk" and, specifically, "K. Martin."

¶ 26                                    D. Hearing Evidence

¶ 27    As noted above, the arbitration hearing commenced on December 5, 2012. The arbitrator reviewed the notices sent to defendants' counsel on November 28, 2012, and December 3, 2012, and noted that neither defendants nor defendants' counsel appeared. Thereafter, Javorek testified that Poulos sought plaintiff's assistance in finding alternative financing so that his businesses could "leave" BMO Harris Bank and avoid foreclosure. Accordingly, plaintiff and defendants entered into the agreement. Although the agreement was dated January 11, 2012, Javorek noted that the check plaintiff received from defendants was dated January 23, 2012. He testified that plaintiff typically treats the date of payment, not the date of the contract's execution, as the date upon which the relationship commences.

¶ 28    Further, Javorek testified that, to provide solutions for defendants, plaintiff enlisted assistance from two different entities, Diamond Bank and Hettich Financing Solutions. At Diamond Bank, plaintiff worked with Jeff Teague, the head of commercial lending. On March 20, 2012, Teague successfully obtained from Diamond Bank on defendants' behalf a loan commitment. As part of that commitment and to prepare for the closing, the bank ordered a title search on the property being used as collateral; the title search reflected that a first mortgage was recorded on that property. According to Javorek, Poulos had not disclosed that mortgage, despite having been asked if Diamond Bank would have first mortgage position on the property. After discovering the mortgage, Diamond Bank could not complete the loan. According to Javorek, had Poulos disclosed that mortgage, plaintiff would not have pursued lending with Diamond Bank. Javorek stated that Poulos "absolutely" misrepresented the facts.

¶ 29    Nevertheless, plaintiff, through Hettich, continued its efforts to obtain long-term financing for defendants. In June 2012, Hettich obtained from the Small Business Administration (SBA) a $1.3 million loan proposal. Hettich communicated the loan proposal to Poulos, who agreed to the loan terms, signed the proposal, and paid a "few thousand dollars," allowing Hettich to proceed to obtain the loan commitment. In August 2012, the loan commitment was finalized. At that time, an SBA representative called BMO Harris Bank, which was "hanging on" until the financing came through, to notify it that the loan would close in approximately 30 days. As the closing date approached, however, Poulos stopped returning calls. Poulos did not complete the process for the financing that Hettich obtained, and, instead, he purportedly had his uncle pay off the BMO Harris Bank loan.

¶ 30    Javorek testified that he extended the parties' agreement in writing and that Poulos never responded. He noted that the agreement required defendants to pay $2,000 to plaintiff upon a successful refinancing and defendants' "departure" from BMO Harris Bank. He testified that plaintiff successfully obtained refinancing on defendants' behalf twice: first, through Diamond Bank, which fell through due to Poulos's misrepresentation, and, second, via the SBA loan. Javorek testified that plaintiff performed all duties pursuant to the agreement's terms and had satisfied the requirements to obtain the $2,000 payment.

¶ 31    The arbitration hearing was continued to December 18, 2012, so that plaintiff could present the arbitrator with sworn affidavits from Hettich and Teague. Consistent with the notices summarized above, however, the December 18 date was continued to December 27, 2012. On

December 27, 2012, plaintiff presented the arbitrator with the notices it had sent to defendants' counsel, along with the confirmations of receipt. The arbitrator noted that neither defendants nor their counsel appeared.

¶ 32 Plaintiff's counsel argued to the arbitrator that, although the agreement was signed on January 11, 2012, Poulos did not make payment until January 23, 2012, and "the date on which he makes payment is obviously the date on which the agreement takes place." Further, counsel argued that "there couldn't have been any contract until the date on which the consideration contemplated by the contract was paid and deposited. And that would be, again, January 25th [*i.e.*, the date that plaintiff deposited the check]."

¶ 33 Javorek further noted that the agreement does *not* require that plaintiff's decision to extend the agreement be in writing and, "as of even July 11th, we had decided to extend the working agreement based on what was going on with the financing for Mr. Hettich." Further, with respect to the Diamond Bank loan, Javorek noted that the agreement required Poulos to fully disclose the financial situation and that Javorek "felt that [Poulos] was misleading everybody in trying to take advantage, and hope that nobody found a mortgage on it, to put this institution in what might be a bad spot." Essentially, Javorek felt that Poulos was hoping to obtain an unsecured loan. Nevertheless, Hettich obtained a proposal for financing, Poulos signed it, and then, after Hettich obtained a commitment and they were heading to closing, Poulos "reneged" on their agreement.

¶ 34 As to the fees, Javorek testified that his agreement with Diamond Bank provides plaintiff 50% of the charged refinancing fee. The fee was $10,000, so $5,000 was payable to plaintiff. The Teague affidavit states that, "if Diamond Bank successfully closed a mortgage or loan to a client referred by [plaintiff], Diamond Bank shall pay a sum equal to 50% of the loan fee to [plaintiff]." Further, it notes that "the fee due to [plaintiff] for the new loan had Poulos not made the aforesaid misrepresentation and the loan closed was to be [$5,000]." Similarly, according to Javorek, plaintiff's agreement with Hettich provides plaintiff 50% of the refinancing fee, which, here, totaled $6,250. The invoice and information was sent to Poulos via overnight delivery, a charge reflected on the invoice. Finally, Javorek testified to the expenses and attorney fees incurred in the dispute related to the parties' agreement.

¶ 35 The arbitrator first found that defendants were given adequate notice of the arbitration hearing and had chosen not to appear. Next, the arbitrator found that the contract was finalized on January 23, 2012, after defendants paid the consideration.

¶ 36 However, that did not end the arbitrator's analysis. He continued that, even accepting the argument that the contract had expired on July 11, 2012, the Hettich affidavit reflects that, on June 13, 2012, defendants were presented with a $1.25 million loan proposal from Home Loan Investment Bank (presumably an SBA lender), defendants signed the loan proposal and paid the deposit of $5,000 to Home Loan, and, further, Poulos returned to Home Loan the documentation that was necessary to move forward toward closing on the loan. Although the affidavit reflects that the loan commitment was obtained on August 12, 2012, "In my view, this is a solution that was obtained during the original contract that was pending, that was clearly accepted by Mr. Poulos."

¶ 37 Further, the arbitrator noted that, according to Teague's affidavit, Diamond Bank processed Poulos's loan application and ultimately approved a new loan in the amount of $1 million. On March 20, 2012, Diamond Bank obtained a title commitment to secure the note, but, based on the resulting information, approval of the new loan was withdrawn. "The

solutions were obtained by Mr. Javorek during the initial period of the contract. So there is no dispute that in his invoice, that the $2,000.00 inclusion, inclusory fee, for obtaining a solution was due."

¶ 38    The arbitrator found that the third-party fees were "clearly" earned, as was the expense for the overnight delivery. Therefore, the arbitrator awarded the $13,281.66 requested in the invoice. Further, he found that the court reporter fees ($280) and attorney fees ($4,000) were reasonable, and "they will be granted."

¶ 39                              E. Trial Court Proceedings

¶ 40    Plaintiff moved the trial court to confirm the arbitration award. In response, defendants argued, in part, that: (1) plaintiff was not entitled to arbitration, because the contract between the parties had expired; (2) the arbitrator was biased; (3) the arbitrator awarded contractual fees, expenses, and attorney fees with no itemization; and (4) plaintiff's notices of arbitration were insufficient, as the arbitrator never served defendants personally or by registered mail and as defendants' counsel was out of town and first received a notice on December 5, 2012, the day of the hearing. Poulos's affidavit, attached to the response, asserted that he did not receive notice of any arbitration date. Defendants' counsel's affidavit, also attached, asserted that: (1) he "never was personally served or signed for any notice of arbitration"; (2) "during the period of November 28, 2012 through December 4, 2012, I was not in my office in that I was out of town for work with several clients"; and (3) he "had no discussions with Plaintiff's counsel or the Arbitrator in this matter in regards to the scheduling of any arbitration, and the first time I learned or [*sic*] any arbitration was upon my return to my office on December 5, 2012, after the arbitration had allegedly already commenced."

¶ 41    Plaintiff's reply asserted that defendants were trying to present a defense to the original cause of action, but should have done so at the arbitration. Instead, defendants "failed to attend the arbitration hearing, failed to seek a continuance, failed to place a phone call, send a letter or send an e-mail, and intentionally disregarded the entire arbitration process."

¶ 42    On May 2, 2013, the trial court held a hearing on the motion to confirm the arbitration award. There, after hearing argument, the court noted that defendants had unilaterally decided and communicated that they would not participate in arbitration. It noted that the provision to arbitrate any dispute over the agreement would include whether the agreement was in effect or had expired. "Otherwise, if [defendants'] position was true, then the party that doesn't want to abide by the arbitration provision could always say, we don't think that's in effect, we're not going to participate, and we want to litigate it, which undercuts the whole intent of having arbitration, having alternative dispute resolution." The court noted that, although defendants now raised arguments regarding whether the agreement was properly extended:

> "[T]o just unilaterally say, our version of that dispute is the correct version, not participate in the arbitration, and then come to court on a case that's already been arbitrated, in this Court's view, is an incorrect way to proceed. You'd have to do one of two things, either [(1)] participate in the arbitration hearing and properly allege that the arbitrator shouldn't arbitrate the dispute and should dismiss the arbitration because the contract was not renewed and the plaintiff didn't otherwise fulfill the terms of the contract or [(2)] bring an action, a Motion to Stay the Arbitration Proceedings, and have a Court rule on it."

The court further addressed defendants' arguments regarding notice and determined that they were "undercut by the facts as they're alleged here. The fact that there was never any intent to participate in the arbitration hearing; that was put in writing. And there's nothing else to indicate that there was ever any attempt to participate in the arbitration hearing. A decision was made about that."

¶ 43 The court ruled that it would confirm the award, but continued the hearing so that plaintiff could present the written award from the arbitrator. Defendants moved to reconsider, and the court denied the motion. On June 19, 2013, the court confirmed and entered the award in the amount of $17,561.66 (which includes the attorney fees and costs). Defendants appeal.

¶ 44                                    II. ANALYSIS

¶ 45 First, we address defendants' argument in their reply brief that plaintiff's response brief should be stricken for failure to cite to the record, in violation of Illinois Supreme Court Rule 341 (eff. Feb. 6, 2013). We decline to strike the brief, but will disregard any portions we deem to violate Rule 341.

¶ 46 On appeal, defendants argue that the arbitration award must be vacated for three reasons. Two concern whether the arbitrator exceeded his authority, and the last concerns defects of notice.

¶ 47                 A. Uniform Arbitration Act and Standard of Review

¶ 48 The parties do not dispute that the Illinois Uniform Arbitration Act (Act) (710 ILCS 5/1 *et seq.* (West 2010)) applies here. Indeed, in Illinois, "the Act must be deemed part of a contract containing an arbitration clause." *Johnson v. Baumgardt*, 216 Ill. App. 3d 550, 560 (1991). Upon executing a contract containing a valid arbitration clause, the parties become "irrevocably committed to arbitrate all disputes arising under the contract." *Id.* at 559; see also 710 ILCS 5/1 (West 2010) ("A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable save upon such grounds as exist for the revocation of any contract ***.").

¶ 49 Arbitration is favored and is viewed by courts as an effective and cost-efficient method for dispute resolution. *Johnson*, 216 Ill. App. 3d at 555-56. Accordingly, where possible, arbitration awards should be construed as valid. Our supreme court has "consistently recognized that the judicial review of an arbitral award is extremely limited." *American Federation of State, County & Municipal Employees, AFL-CIO v. Department of Central Management Services*, 173 Ill. 2d 299, 304 (1996). Indeed, the Act expressly limits judicial review of an arbitrator's award; thus, our review of an arbitration award is "nothing like the scope" of our review of a trial court decision. See *International Ass'n of Firefighters, Local No. 37 v. City of Springfield*, 378 Ill. App. 3d 1078, 1080-81 (2008). Specifically, section 12 of the Act provides that a court shall vacate an arbitrator's award *only* in instances of fraud, corruption, partiality, misconduct, mistake (specifically, where "[t]he arbitrators exceeded their power"), refusal to postpone the hearing after sufficient cause shown, refusal to hear evidence material to the controversy, or failure to submit the question to arbitration. 710 ILCS 5/12(a)(1)-(5) (West 2010); *Central Management Services*, 173 Ill. 2d at 304.

¶ 50    Regarding section 12(a)(3) (vacating an award because the arbitrator exceeded his or her authority), there exists a presumption that the arbitrator did *not* exceed his or her authority. *City of Springfield*, 378 Ill. App. 3d at 1081. The question for the court is simply whether the arbitrator's interpretation of the parties' contract is a "reasonably possible one that can seriously be made in the context in which the contract was made," and the court must vacate the award only if "all fair and reasonable minds would agree that the construction of the contract made by the arbitrator was not possible under a fair interpretation of the contract." (Internal quotation marks omitted.) *Rauh v. Rockford Products Corp.*, 143 Ill. 2d 377, 391-92 (1991). "Gross errors of judgment in law or a gross mistake of fact are not grounds for vacating an award unless the mistakes or errors are apparent upon the face of the award." *Id.* at 393. "Because the parties have contracted to have their disputes settled by an arbitrator, rather than by a judge, it is the arbitrator's view of the meaning of the contract that the parties have agreed to accept. We will not overrule that construction merely because our own interpretation differs from that of the arbitrator." *Central Management Services*, 173 Ill. 2d at 305. Generally speaking, if the contract is susceptible to more than one interpretation, and the arbitrator acts in good faith, "the award is deemed conclusive upon the parties." *City of Springfield*, 378 Ill. App. 3d at 1081; see also *Garver v. Ferguson*, 76 Ill. 2d 1, 10 (1979).

¶ 51                          B. Defendants' Arguments

¶ 52    On appeal, defendants argue that the arbitrator exceeded his authority in two respects and that, under section 12(a)(3) of the Act, the award must be vacated. First, defendants argue that, because the contract had expired, there was no basis for holding an arbitration. On this point, they further assert that the arbitrator improperly extended the term of the contract by finding an implied contract term, *i.e.*, that the six-month contract period began not on the execution date, but, rather, upon receipt of the consideration. Second, defendants argue that the arbitrator exceeded his authority in awarding plaintiff attorney fees.[1] Defendants' final argument on appeal is that the arbitration award must be vacated because notice of the hearing was deficient.

¶ 53    Defendants' arguments fail because they are forfeited. To preserve for judicial review a claim that issues were not subject to arbitration, a party must object in a timely manner. See *First Health Group Corp. v. Ruddick*, 393 Ill. App. 3d 40, 48 (2009) (finding forfeited an argument that the arbitrator exceeded his authority); see also *Galasso v. KNS Cos.*, 364 Ill. App. 3d 124, 133 (2006) (claim that arbitrator exceeded authority because attorney fees were not arbitrable was forfeited, where no motion was made to trial court challenging the arbitrability of fees, nor was any objection made before arbitrator challenging arbitrability of fees). A timely objection might save the time and expense of an unwarranted arbitration.

_____

[1]In their argument's introduction section, defendants also allege that the arbitrator exceeded his authority by awarding damages to plaintiff for fees incurred after the term of the contract had expired. They broadly assert in their reply brief, without detail, that the arbitrator ruled on disputes that occurred months after the contract expired and that plaintiff submitted fees allegedly incurred four months after the contract expired. The assertion is belied by the record in that, regardless of the date of billing, the arbitrator found that the events giving rise to the issues and fees arose during the original term of the agreement. In any event, given that defendants do not develop this argument, it is forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013); see also *Vilardo v. Barrington Community School District 220*, 406 Ill. App. 3d 713, 720 (2010).

- 10 -

*Ruddick*, 393 Ill. App. 3d at 48. A party cannot "sit silent, wait until an adverse award [is] issued, and then first argue that the arbitrator did not have the authority even to hear the claim." *Id.* at 52. "Failure to raise a timely objection results in the waiver of even a legitimate claim." *Id.* If a party has a legitimate argument against submitting claims to an arbitrator, it must raise the issue before the arbitrator. *Id.* Alternatively, a party may move the trial court for a stay and a ruling on whether the arbitration provision expired with the agreement. 710 ILCS 5/2(b) (West 2010) ("[o]n application, the court may stay an arbitration proceeding *commenced or threatened* on a showing that there is no agreement to arbitrate" (emphasis added)).

¶ 54     Here, we would be hard pressed to imagine a situation more clearly reflecting forfeiture. There is no dispute that, at least from January 11, 2012, to July 11, 2012, an agreement containing an arbitration provision existed between the parties. Defendants were notified in writing that plaintiff intended to proceed to arbitration under the agreement. At that time, defendants did not move the court pursuant to section 2(b) of the Act to stay the "threatened" arbitration. *Id.* Instead, defendants communicated on multiple occasions that they would refuse to participate in any arbitration. Thereafter, defendants' counsel received notices of the arbitration hearing, with counsel acknowledging that he reviewed the first notice on the first day of the hearing. Assuming that counsel communicated this information to his clients, they necessarily made a calculated decision at that time to do nothing in response. They did not move the court pursuant to section 2(b) of the Act to stay the "commenced" arbitration (*id.*), nor did they object or file any motion before the arbitrator arguing that plaintiff's claims were not subject to arbitration or that the arbitration should not proceed without them because notice was deficient. Instead, as the trial court rightly pointed out, defendants unilaterally decided that their position was correct and they simply refused to participate.

¶ 55     As the trial court noted, defendants' stance here directly undermines the purpose of alternative dispute resolution. Defendants simply chose not to raise their defenses and arguments before judgment was rendered. Accordingly, they cannot now find cause to complain that their gambit did not pay off. As such, defendants' arguments are forfeited.

¶ 56     We could end our analysis here. Nevertheless, we choose to briefly explain why defendants' arguments fail for additional reasons.

¶ 57                      1. Arbitrator Did Not Exceed His Authority

¶ 58     As mentioned above, defendants argue for two reasons that the arbitrator exceeded his authority and that the award must be vacated. We disagree.

¶ 59     First, defendants cite no authority for their assertion that, even if the arbitrator exceeded his authority, vacating the award outright is the remedy. Indeed, section 12(c) of the Act provides that, where an award is vacated pursuant to section 12(a)(3), the court may order a rehearing before the same arbitrator (or his or her successor) who made the award. 710 ILCS 5/12(c) (West 2010).

¶ 60     Second, defendants' first issue is really twofold: (1) First, assuming that it had not been extended, did the agreement's expiration result in plaintiff having no basis for seeking arbitration, and (2) second, did the arbitrator exceed his authority by improperly extending the contract by adding an implied term (*i.e.*, that receipt of the consideration started the contract's six-month period)? As to the first, defendants do not cite any authority for the proposition that an agreement's expiration necessarily nullifies the arbitration provision, such that arbitration

of issues that pertain to or concern the agreement is precluded. This argument (already forfeited for a failure to timely raise it below) is accordingly forfeited as undeveloped and lacking authority. Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013); see also *Vilardo*, 406 Ill. App. 3d at 720.

¶ 61   Furthermore, we note that the parties' agreement provided that "*any dispute over this Working Agreement* shall be handled by a reasonable 3rd party to act as an intermediate, arbitrator or negotiator. Any decision by this 3rd party is to be final and [defendants] and [plaintiff] waive any right to trial." (Emphasis added.) These types of arbitration agreements, essentially providing that claims arising from or related to the agreement will be arbitrated, are considered "generic" arbitration clauses. *Johnson*, 216 Ill. App. 3d at 558. A dispute falls within the scope of a "generic" arbitration clause if it arises out of the subject matter of the contract. *Id.* Here, the claims that plaintiff sought to arbitrate, *i.e.*, its rights to fees for work it performed on defendants' behalf, arose out of the subject matter of the contract. Accordingly, the claims for fees were arbitrable.

¶ 62   As to the second question (whether the arbitrator improperly extended the contract), defendants cite authority for the general proposition that courts and arbitrators cannot change or add terms to agreements. However, we agree with the trial court that the provision to arbitrate any dispute over the agreement would include whether the agreement remained in effect.[2] Again, defendants forfeited this argument because they unilaterally decided below that plaintiff's extension was invalid.

¶ 63   Further, in practical terms, the issue of contract extension effectively disappears here because the award was not based on the arbitrator's allegedly improper extension of the contract. Rather, the arbitrator found that, *even if the contract had expired*, defendants owed fees based on work that plaintiff performed *during the original six-month period*. Therefore, the allegedly improper exercise of the arbitrator's authority, *i.e.*, inserting an implied term into the contract, was not even the basis of the award. Moreover, even if the arbitrator did err in holding that the contract was extended beyond the six-month deadline specified in the contract, the aforementioned authority reflects that even gross mistakes of law or fact do not serve as a basis for vacating an award. It does not matter if we disagree with the court's interpretation of the parties' contract if the arbitrator's interpretation was a reasonably possible one. *Rauh*, 143 Ill. 2d at 392. Here, we cannot find that "all fair and reasonable minds would agree that the construction of the contract made by the arbitrator was not possible under a fair interpretation of the contract." (Internal quotation marks omitted.) *Id.*

¶ 64   Defendants next argue that the arbitrator exceeded his authority by awarding plaintiff attorney fees under the agreement. Defendants note that the Act provides that, "unless otherwise provided in the agreement to arbitrate, the arbitrators' expenses and fees, together with other expenses, *not including attorney's fees*, incurred in the conduct of the arbitration, shall be paid as provided in the award." (Emphasis added.) 710 ILCS 5/10 (West 2010).

---

[2]For example, in *Beider v. Eugene Matanky & Associates, Inc.*, 55 Ill. App. 3d 354 (1977), a generic arbitration provision called for arbitration of any controversy or claim arising out of or relating to the contract. One party to the contract sought to terminate the agreement, but the other, within 30 days from the notice of termination, performed services on the first party's behalf. The court found that questions concerning whether the agreement had been terminated remained within the scope of the arbitration clause. *Id*. at 359.

Defendants assert that this provision has been interpreted to mean that an arbitrator may not award attorney fees unless the arbitration agreement provides for fees. Here, they argue, the provision is a general agreement to arbitrate that "does not contain any language expressly granting an arbitrator the authority to award attorney fees."

¶ 65   Again, this issue is forfeited, not only because defendants did not challenge the arbitrability of attorney fees before the trial court or the arbitrator prior to the award (*Galasso*, 364 Ill. App. 3d at 133), but also because they did not raise this argument before the trial court in their response to plaintiff's motion to confirm the award.

¶ 66   Further, defendants baldly assert that the agreement does not provide for attorney fees when, in fact, it clearly does. As noted above, the agreement provides that, "[t]o the fullest extent permitted by law, [defendants] shall pay all costs, *including reasonable attorney's fees*, court costs and collection costs without litigation or other formal proceedings, expended or incurred by [*sic*] in enforcing or defending any provision of this Working Agreement or any dispute arising from or related to this Working Agreement if Loss Mitigation is the prevailing or successful party in such action(s)." (Emphasis added.) Defendants acknowledge this clause only in reply to plaintiff's reliance upon it, asserting that it appears in a different portion of the contract and applies only if an entity named "Loss Mitigation" prevails. Defendants argue that it is unclear what "Loss Mitigation" refers to and that, as plaintiff drafted the contract, the ambiguity should be construed against it.

¶ 67   We reject these arguments. We read a contract as a whole, and provisions are ambiguous only if subject to more than one reasonable interpretation. See, *e.g.*, *United States Fire Insurance Co. v. Schnackenberg*, 88 Ill. 2d 1, 5 (1981). Reading the contract here as a whole, it is apparent that "loss mitigation," as it appears in other portions of the contract, is a service that plaintiff contracted to provide to defendants. As such, reading the attorney-fee provision in the context of the contract as a whole, it is apparent that the only reasonable interpretation is that "Loss Mitigation" as used in the clause is referring to plaintiff.

¶ 68   In short, the arbitrator did not exceed his authority and we will not vacate the award.

¶ 69                                                    2. Notice

¶ 70   We next address defendants' arguments regarding notice. Defendants assert that the arbitration award must be vacated because the notices of the arbitration hearing were statutorily defective in that they: (1) were sent by plaintiff, not the arbitrator; (2) were sent by certified mail, return receipt requested, or by FedEx, instead of by registered mail; and (3) were not received five days prior to the hearing.

¶ 71   First, as noted above, this argument is forfeited for failure to raise it below. Second, even if we were to accept their notice arguments, defendants cite no authority for the proposition that vacating the award outright is the appropriate remedy for a defect in notice, and therefore the argument is forfeited on this additional basis. *Vilardo*, 406 Ill. App. 3d at 720. Again, the Act limits a court's authority to vacate an award to those bases listed in section 12, none of which includes defects in notice, and section 12 contemplates remanding for a new arbitration even if one of the specified bases is established.[3] 710 ILCS 5/12(c) (West 2010). Further, we note that

---

[3]At oral argument, defendants' counsel referenced *Alexander v. Cunningham*, 111 Ill. 511 (1884), which is inapplicable here, not only factually (the award there was vacated because there was *no* notice

- 13 -

defendants raise no argument that the parties' agreement provided any notice requirements separate from those in the Act.

¶ 72 Third, section 5(a) of the Act, which provides for notice, specifies that "[t]he arbitrators shall *** cause notification to the parties to be served personally or by registered mail not less than 5 days before the hearing." 710 ILCS 5/5(a) (West 2010). Accordingly, contrary to defendants' assertion, the arbitrator himself or herself is not required to personally effectuate service but, rather, he or she must "cause" service to be made upon the parties.

¶ 73 Fourth, while the statute specifies that service should be made by registered mail, some courts have found that certified mail, return receipt requested, is the functional equivalent of registered mail for service purposes and does not deny the defendants process to which they are entitled. See, *e.g.*, *Olin Corp. v. Bowling*, 95 Ill. App. 3d 1113, 1116-17 (1981). Defendants disagree, relying on *Burton v. Autumn Grain Transport, Inc.*, 222 Ill. App. 3d 755 (1991); however, as that case involved service necessary to effectuate personal jurisdiction over a nonresident of Illinois, we find it of little value here.

¶ 74 In any event, there is no doubt that defendants received actual notice. Courts may be reluctant to enforce technical service rules where it is clear that the defendants received actual notice. See, *e.g.*, *In re M.G.*, 301 Ill. App. 3d 401, 412 (1998). Here, defendants' counsel's affidavit before the trial court attests that notice was delivered to his office, but that he was out of town and did not see it until December 5, 2012, the day of the hearing. Nevertheless, the record reflects that the notice was received by his office on November 29, 2012, and, even if counsel became aware of it late, he chose to do nothing about it. Further, the affidavit does not attest that he did not receive the three subsequent notices sent to him when the arbitration hearing was continued. At oral argument, defendants noted that section 5 of the Act provides that "[a]ppearance at the hearing waives such notice," suggesting that, if they appeared at the hearing, their arguments about defective notice would have been forfeited. 710 ILCS 5/5(a) (West 2010). However, setting aside the fact that the reason for that provision is presumably that an appearance reflects *actual* notice, defendants could still have made their objections known, via motion, letter, or otherwise, to the arbitrator or the trial court without appearing at the arbitration.

¶ 75 Finally, and as the trial court noted, any arguments concerning defective notice in this case are undermined by the record, which reflects that, regardless of notice, defendants had already communicated that they would not participate in any arbitration hearing. As such, their notice arguments are unavailing.

¶ 76 In sum, defendants have failed to establish grounds for vacating the arbitration award.

---

given to a party and the arbitrators acted *ex parte*) but also because it predates this state's adoption of the Act and its provisions governing notice and bases for vacating awards.

- 14 -

¶ 77                                    III. CONCLUSION

¶ 78            For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

¶ 79            Affirmed.