In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 14-3478

RONALD and ANNA ANDERMANN, *et al.*, on behalf of
themselves and all others similarly situated,

*Plaintiffs-Appellees*,

*v.*

SPRINT SPECTRUM L.P.,

*Defendant-Appellant*.

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14 C 1004 — **Rebecca R. Pallmeyer**, *Judge*.

_____

ARGUED APRIL 6, 2015 — DECIDED MAY 11, 2015

_____

Before POSNER and SYKES, *Circuit Judges*, and SIMON, *Chief
District Judge*.[*]

POSNER, *Circuit Judge*. Sprint, the defendant, appeals from
the denial by the district court of its motion under 9 U.S.C.
§ 4 to order arbitration of a class action suit brought against

_____

[*] Hon. Philip P. Simon of the Northern District of Indiana, sitting by des-
ignation.

it by the Andermanns for alleged violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227. Interlocutory appeals from denials of motions to order arbitration are authorized by 9 U.S.C. § 16(a)(1)(B).

The Andermanns had obtained mobile phone service from U.S. Cellular in 2000 under a renewable two-year contract that was renewed for the last time in 2012. The contract included an arbitration clause which provided that "any controversy or claim arising out of or relating to this agreement [i.e., the contract for mobile phone service] shall be resolved by binding arbitration" and that "this arbitration agreement survives the termination of this service agreement."

The contract also provided that "U.S. Cellular may assign this Agreement [again, the service contract] without notice to you," "you" being the customer. And in May of the following year (2013) U.S. Cellular did just that—it sold the Andermanns' service contract, complete with the arbitration clause, to Sprint, without notice to the Andermanns. Several months later Sprint sent a letter to them informing them of the sale and that their mobile service would be terminated on January 31 of the following year (2014). The reason given in the letter was that some of U.S. Cellular's cellphones—including the Andermanns'—were not compatible with Sprint's network, and so the Andermanns would either have to get new cellphones or obtain their mobile phone service from another company. The letter added that Sprint was offering attractive substitutes for the terminated service and gave the recipients of the letter a Sprint phone number to call if they were interested in the offers or devices.

In December Sprint phoned the Andermanns to remind them that their service was about to expire, and added that Sprint had "a great set of offers and devices available to fit [their] needs." Sprint made six such calls (three to each of the Andermanns), all to no avail—for all were made within a month after the Andermanns had signed on with another mobile service provider. And anyway the Andermanns answered none of the calls; instead they brought this suit, contending that the unsolicited advertisements contained in the calls violated the Telephone Consumer Protection Act. Sprint responded by asking the district court to order arbitration, on the ground that the service contract renewed in 2012 that the Andermanns had signed required that the dispute kicked off by their suit be decided by an arbitrator, because the dispute arose out of and thus related to that contract. Although the contract had been between U.S. Cellular and the Andermanns rather than between Sprint and them, by virtue of the assignment to Sprint (and remember that the Andermanns had consented in their contract with U.S. Cellular to its assigning the contract without notice to them), Sprint had stepped into U.S. Cellular's shoes.

The Andermanns point out that the actual assignee was Sprint Solutions, Inc., rather than the defendant in this suit, Sprint Spectrum L.P., and they argue that because Sprint Spectrum, though of course an affiliate of Sprint Solutions, is not the assignee it can't require them to arbitrate their dispute with it. The argument has no merit. For reasons that the Andermanns have not shown to have any connection to the parties' dispute, Sprint Solutions was designated to be Sprint Spectrum's agent to hold the contracts assigned to Sprint by U.S. Cellular, including therefore the Andermanns' contract.

The district court ruled for the Andermanns but on a different ground—that since Sprint's contract with them terminated before the phone calls that are the basis of this lawsuit, the dispute over the legality of the calls could not have arisen from or related to the contract. Actually there's an intimate relation. The contract authorized an assignment, and because of the incompatibility of the assignor's (U.S. Cellular's) cellphones and the assignee's (Sprint's) mobile phone network, Sprint had had to terminate the U.S. Cellular customers, such as the Andermanns, whom it had acquired by virtue of the assignment; for they could not use their cellphones without switching to a different network. It was to prevent the loss of all these customers because of the incompatibility that Sprint had told them in the calls that it could offer them a substitute service. The calls gave rise to the dispute; and so the Andermanns were required to arbitrate the dispute.

Against this conclusion, which is strongly supported by this court's decision in *Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.*, 1 F.3d 639 (7th Cir. 1993), the Andermanns offer an untenable interpretation of our decision in *Smith v. Steinkamp*, 318 F.3d 775, 777 (7th Cir. 2003). They say we said "that allowing the arbitration clause in the payday loan agreement to apply to statutory and tort claims arising after the transactions regarding that loan were completed would lead to 'absurd results.'" The quotation is from the Andermanns' brief; the only term quoted from the *Smith* opinion is "absurd results." What we said, which differs totally from the Andermanns' characterization of what we said, is that "absurd results" would ensue if the arising-from and relating-to provisions contained in a payday loan agreement, defining what disputes would have to be arbi-

trated rather than litigated, were cut free from the loan and applied to a subsequent payday loan agreement that did not contain those provisions. See *id*. at 776–77. That is not this case. The Andermanns' contract, containing the arising-out-of or relating-to provisions, is a single contract.

Sprint gilds the lily, however, in telling us that arbitration is a darling of federal policy, that there is a presumption in favor of it, that ambiguities in an arbitration clause should be resolved in favor of arbitration, and on and on in this vein. It's true that such language (minus the "darling") appears in numerous cases. E.g., *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24–25 (1983); *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909 (7th Cir. 1999). But the purpose of that language is to make clear, as had seemed necessary because of judges' historical hostility to arbitration, that arbitration was no longer to be disfavored—especially in labor cases, see, e.g., *Granite Rock Co. v. International Brotherhood of Teamsters*, 561 U.S. 287, 298–99 (2010), where arbitration is now thought a superior method of dispute resolution to litigation.

The Federal Arbitration Act is inapplicable to labor disputes, however, and merely makes clauses providing for the arbitration of disputes arising out of transactions involving interstate or foreign commerce, as the dispute in this case is conceded to arise, enforceable in federal and state courts. 9 U.S.C. §§ 1, 2. The issue is then one of interpreting the clause to see whether it covers the dispute. It's not clear that arbitration, which can be expensive because of the high fees charged by some arbitrators and which fails to create precedents to guide the resolution of future disputes, should be preferred to litigation. And it's not clear why, so far as elicit-

ing the meaning of a given arbitration clause is concerned, such a clause should be distinguished from any other clause in a contract. The cases do say that arbitration clauses are to be "generously construed," e.g., *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625–26 (1985), but we take that to mean that judges should not allow any preference they might have for judicial resolution of a legal dispute to override the parties' dispute-resolution preferences as embodied in an arbitration clause.

But this is an aside; with or without generous interpretation, Sprint is entitled to arbitrate. It may seem odd that it *wants* arbitration, or at least wants it badly enough to appeal the denial of its motion asking the district court to order arbitration, since it appears to have a very strong substantive defense to the suit—a defense at least as likely to persuade a judge as an arbitrator. But doubtless it wants arbitration because the arbitration clause disallows class action arbitration. If the Andermanns' claims have to be arbitrated all by themselves, they probably won't be brought at all, because the Andermanns if they prevail will be entitled only to modest statutory damages.

But in whatever form contested, the claims are unlikely to prevail. To treat the phone calls as unsolicited advertisements overlooks the fact that as U.S. Cellular's successor in providing mobile phone service to the Andermanns, Sprint had a relation to them that preexisted the calls. The incompatibility of U.S. Cellular's cellphones with Sprint's network required Sprint to inform the Andermanns that the service they thought they had would soon be terminated, and it was natural for Sprint to assume that they wanted to continue to have a mobile communications service and would therefore

appreciate knowing that Sprint offered a substitute service—the knowledge would enlarge the Andermanns' options. One would expect that if not the Andermanns then some other recipients of Sprint calls would want to know about Sprint's substitutes for U.S. Cellular service because they too would soon need to find a replacement for that service.

What would Sprint have done if forbidden to call the customers whom it had inherited from U.S. Cellular and must now terminate because of technical incompatibility? Post on highway billboards or subway advertisements the text of its calls to the customers it had acquired from U.S. Cellular? Post the messages in the ad sections of newspapers? In television commercials? More likely the case falls within the exception in the Telephone Consumer Protection Act for telephone solicitations made "to any person with whom the caller has an established business relationship." 47 U.S.C. § 227(a)(4)(B); see, e.g., *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726–27 (7th Cir. 2011). By stepping into U.S. Cellular's shoes Sprint established a business relationship that Sprint would have disrupted had it told the Andermanns only that their services was going to be cut off, without adding its offer to substitute an equivalent service. So truncated a communication would gratuitously have deprived the Andermanns of what might have been an attractive opportunity for them, though whether it was or not we'll never know because the Andermanns neither took any of Sprint's calls nor called back, instead signing on with another service provider before they learned whether Sprint would make than an offer as good or better.

We don't want to step on the arbitrator's toes; the evidence presented and arguments made to him or her may

cast the substantive issue in a different light. All we hold, therefore, is that Sprint's motion to order arbitration should have been granted. The judgment of the district court is therefore reversed and the case remanded to that court with instructions to order arbitration.

REVERSED AND REMANDED.