In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-1471

BANKERS LIFE & CASUALTY INSURANCE CO.,

*Plaintiff-Appellant*,

*v.*

CBRE, INC.,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14 C 7907 — **Harry D. Leinenweber**, *Judge*.

ARGUED DECEMBER 10, 2015 — DECIDED JULY 29, 2016

Before POSNER, MANION, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. A dispute between the parties was referred to a panel of arbitrators, who voted in favor of CBRE, a large real estate company. Its opponent, Bankers, an insurance company, challenged the arbitrators' decision in federal district court, lost there, and appeals.

In 2011 Bankers leased office space at 600 West Chicago Avenue in Chicago. Its lease was set to expire in 2018. An-

other tenant in the building was Groupon, the well-known online merchant, which needed more office space. CBRE approached Bankers about the possibility of Bankers' subleasing its space in the building to Groupon and relocating elsewhere, and Bankers responded to CBRE's overtures by hiring it to negotiate a sublease to Groupon and find an alternative location for Bankers. Bankers and CBRE signed a Listing Agreement which provided that CBRE would "accept delivery of and present [to Bankers] all offers and counteroffers to buy, sell, or lease … property" of Bankers; "would assist [Bankers] in developing, communicating, negotiating, and presenting offers, counteroffers, and notices"; and would "answer [Bankers'] questions relating to the offers, counteroffers, notices, and contingencies." These terms were required by Illinois law. 225 ILCS 454/15-5(a), 15-75.

Bankers was unwilling to sublease its space at 600 West Chicago Avenue without obtaining a comparable lease elsewhere; moreover, it wanted its revenue from subleasing its space in that building to Groupon to exceed the cost of its new lease elsewhere. CBRE agreed, consistently with its having agreed in the Listing Agreement to present "offers" to Bankers and answer any questions Bankers might have about the offers that CBRE obtained. Bankers told CBRE that it wanted to net $7 million from its deals with Groupon and the lessor of the space that Bankers would obtain to replace the space it would be subleasing to Groupon. The $7 million would be the consequence of the generous income that Bankers would receive from its sublease to Groupon combined with Bankers' inexpensive relocation elsewhere.

CBRE responded by presenting Bankers with a series of cost-benefit analyses (CBAs), comparing the costs of leasing

new space with the benefits of subleasing the old space to Groupon. A CBA delivered by CBRE to Bankers in May 2011 showed a net savings to Bankers from relocating to 111 East Wacker Drive of $6.9 million. As this was within $100,000 of the deal Bankers was seeking, it responded to the information in the CBA by subleasing its West Chicago Avenue space to Groupon and leasing the space on East Wacker Drive for itself.

CBRE's calculation was inaccurate. It omitted Bankers' promise, as part of the deal with Groupon, to give Groupon a $3.1 million tenant improvement allowance to enable Groupon to improve the space formerly occupied by Bankers. The uncontradicted evidence is that had Bankers known it would profit by only $3.8 million ($6.9 million – $3.1 million) from the deal package (lease plus sublease), it would have rejected the deal and thus not have relocated and CBRE would not have obtained the $4.5 million in commissions that it received as compensation for having arranged the sublease to Groupon and Bankers' relocation to East Wacker Drive.

The upshot was an arbitration proceeding conducted by Judicial Arbitration and Mediation Services (JAMS), in which Bankers sought to recoup the lost $3.1 million and to avoid having to pay commissions to CBRE because by failing to provide Bankers with accurate information CBRE had violated the Listing Agreement, failed to perform the duties imposed on it by the Illinois Real Estate License Act, and committed the tort of negligent misrepresentation. In February 2014 the arbitration panel issued its award (actually it turned out to be only its first award), ruling that while CBRE had indeed erred in greatly exaggerating the value of the

sublease/lease deal that it had arranged for Bankers, it had not violated the Listing Agreement because the agreement did not explicitly require CBRE to furnish Bankers with a correct CBA, and CBRE had not violated its obligations, set forth in the Listing Agreement, to assist Bankers "in developing, communicating, negotiating and presenting offers, counteroffers and notices" and "to answer [Bankers'] questions relating to offers, counteroffers, notices, and contingencies." Oddly, the panel said that "the mistake in CBRE's analysis on the summary pages of the CBAs is not a violation of its obligation to assist Bankers 'in developing, communicating, negotiating and presenting offers[,] counteroffers and notices'" nor a failure to "answer [Bankers'] questions relating to offers, counteroffers, notices, and contingencies." It's hard to imagine what else the mistake might be. The panel rejected Bankers' other arguments as well.

Evidently the panel had misgivings. For four months later (June 2014), in response to Bankers' unsurprising motion for reconsideration of the award, the panel changed course. It now acknowledged "that the Listing Agreement obligated CBRE to answer questions accurately" and that "CBRE [had] made a mistake and that mistake was material." Yet the panel adhered to its earlier ruling in favor of CBRE, on the ground that "as stated by Bankers, the required answers [to questions Bankers had put to the brokerage firm concerning the sublease to Groupon and the leasing of alternative premises for Bankers] *were* the CBAs" (emphasis in original) and "the CBAs … included a disclaimer that provided that CBRE was not guaranteeing that there were not any errors contained in the CBA. Here, there was an arithmetic error, or an error in aligning the columns of numbers. The disclaimer clearly provides that CBRE was not responsible for errors."

The next month the panel issued another "final award" (the original award having been downgraded to interim status), again in favor of CBRE, to which it now awarded costs.

The panel exceeded its authority. It was authorized to interpret the contract. The contract did not include the cost-benefit analyses. The panel's reliance on the disclaimer in the CBAs was therefore unjustified. The disclaimer is not part of the Listing Agreement; it was not negotiated by the parties but merely inserted by CBRE unilaterally. The CBAs—the only places in which the disclaimer appears—not only are not part of the agreement; they are not mentioned in it. They were just the format, the vehicle, in which CBRE responded to Bankers' inquiries about the progress of the negotiations for the subleasing of Bankers' space on West Chicago Avenue and the relocation of Bankers to East Wacker Drive. But as such responses—responses to Bankers' "questions relating to offers, counteroffers, notices, and contingencies"— were inaccurate, they were not responsive, and thus violated the Listing Agreement, which as the panel said in its order required "that … CBRE … answer questions accurately."

The arbitrators' role was to interpret the agreement, not additions to it by one party without the consent of the other—such additions could not amend the agreement. Having belatedly discovered that it had failed to disclaim liability under the Listing Agreement, CBRE should have asked Bankers for a modification of the agreement. Instead it snuck the disclaimer into documents that had not been agreed upon by the parties. It was like Mr. A agreeing in writing to pay Mr. B $10 dollars, and B responding (with hand held out, and palm open): "I have changed $10 to $20." The arbitrators attempted to amend the contract with a document

that was not part of the contract. The district court let them get away with it.

True, an error does not normally invalidate an arbitration award; otherwise such awards would have no greater immunity from judicial review than decisions by district judges or administrative agencies. The idea is that by electing arbitration the parties have chosen to bypass the judicial system. As we said in *Wise v. Wachovia Securities, LLC*, 450 F.3d 265, 269 (7th Cir. 2006), "when parties agree to arbitrate their disputes they opt out of the court system, and when one of them challenges the resulting arbitration award he perforce does so not on the ground that the arbitrators made a mistake but that they violated the agreement to arbitrate, as by corruption, evident partiality, exceeding their powers, etc.— conduct to which the parties did not consent when they included an arbitration clause in their contract." Or as the Illinois Supreme Court said in *Garver v. Ferguson*, 389 N.E.2d 1181, 1183–84 (Ill. 1979), Illinois courts will not vacate an arbitration award for mere "errors in judgment or mistakes of law" unless "gross errors of judgment in law or a gross mistake of fact" are "apparent upon the face of the award"— which is this case. See also *Rauh v. Rockford Products Corp.*, 574 N.E.2d 636, 644 (Ill. 1991), which attributes that rule to the Illinois Uniform Arbitration Act, 710 ILCS 5/12(3), which governs this case because it is a diversity case arising under Illinois law. And similarly in *First Merit Realty Services, Inc. v. Amberly Square Apartments, L.P.*, 869 N.E.2d 394, 399 (Ill. App. 2007), we read that because "arbitrators' authority is limited by the unambiguous contract language," they "do not have the authority to ignore the plain language of the contract and to alter the agreement, as the ultimate award must be grounded on the parties' contract." And so when

"arbitrators ma[k]e an evident miscalculation of figures in arriving at the award, the reviewing court will modify or correct the award." *Shearson Lehman Brothers, Inc. v. Hedrich*, 639 N.E.2d 228, 232 (Ill. App. 1994). In this case the arbitrators made, or more precisely endorsed, a $3.1 million miscalculation.

There was a time when commercial arbitration awards contained *no* reasoning, in order to avoid attracting the scrutiny of judges, who were fiercely hostile to arbitration, which they viewed as a competitor of adjudication. Thomas E. Carbonneau, "Rendering Arbitral Awards with Reasons: The Elaboration of a Common Law of International Transactions," 23 *Columbia Journal of Transnational Law* 579, 583–84 (1985); *Andermann v. Sprint Spectrum, L.P.*, 785 F.3d 1157, 1159 (7th Cir. 2015). But increasingly parties to arbitration insist on "reasoned awards." See Judith Resnik, "Diffusing Disputes: The Public in the Private of Arbitration, the Private in Courts, and the Erasure of Rights," 124 *Yale L.J.* 2804, 2809 (2015); Stephen L. Hayford, "A New Paradigm for Commercial Arbitration: Rethinking the Relationship Between Reasoned Awards and the Judicial Standards for Vacatur," 66 *George Washington L. Rev.* 443, 446 and n. 9 (1998). They did in this case, by selecting JAMS to arbitrate; for JAMS requires the award to "contain a concise written statement of the reasons for the Award" unless the parties agree otherwise, which they didn't in this case.

Because the parties bargained for a reasoned award, reasoning should be part of the "face of the award." But the award in this case was based on documents outside the parties' agreement and ignored the agreement itself—the Listing Agreement. Cf. *Rauh v. Rockford Products Corp.*, *supra*, 574

N.E.2d at 644. The arbitration panel realized or at least sensed that it had ignored the Listing Agreement when it issued its June revision of the award, but the new reasoning in that revision confused the cost-benefit analyses with the Listing Agreement. The district court should not have upheld the award. Its judgment is therefore reversed and the case remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED

SYKES, *Circuit Judge*, dissenting. I part company with my colleagues based on the narrow scope of our review. This case is governed by the Illinois Uniform Arbitration Act ("IAA"). Like its federal counterpart, the IAA permits only very limited judicial review. A court may vacate an arbitration award only if the arbitrators "exceeded their powers." 710 ILL. COMP. STAT. 5/12(a)(3). The Federal Arbitration Act ("FAA") uses identical language, *see* 9 U.S.C. § 10(a)(4), and the statutes share the same origin (the Uniform Arbitration Act), so the state statute has long enjoyed parallel construction with the federal. *J & K Cement Constr., Inc. v. Montalbano Builders, Inc.*, 456 N.E.2d 889, 893 (Ill. 1983); *Rexnord Indus., LLC v. RHI Holdings, Inc.*, 906 N.E.2d 682, 684 (Ill. App. Ct. 2009); *Cook County v. Am. Fed'n of State, Cnty. & Mun. Emps., Local 3315*, 691 N.E.2d 777, 780 (Ill. App. Ct. 1998).

In its seminal decision on judicial review of arbitration awards, the Illinois Supreme Court held that "an arbitrator's award will not be set aside because of his errors in judgment or mistakes of law or fact." *Garver v. Ferguson*, 389 N.E.2d 1181, 1183 (Ill. 1979). *Garver* continues:

> The fact that arbitrators have made an erroneous decision will not vitiate their award. If they have acted in good faith, the award is conclusive upon the parties; and neither party is permitted to avoid it[] by showing that the arbitrators erred in their judgment, either respecting the law or the facts of the case.

*Id*. (quoting *Merritt v. Merritt*, 11 Ill. 565, 567 (1850)). Finally, *Garver* explains that "[w]henever possible a court must construe an [arbitration] award so as to uphold its validity, and gross errors of judgment in law or a gross mistake of

fact will not serve to vitiate an award unless these mistakes or errors are apparent upon the face of the award." *Id.* at 1184 (citation omitted). Later cases are in accord. *See, e.g., Rauh v. Rockford Prods. Corp.*, 574 N.E.2d 636, 641 (Ill. 1991).

We've said much the same thing when describing the scope of judicial review under the FAA. Almost three decades ago we explained that a gross error in interpreting the parties' contract will not suffice to vacate an arbitration award, but a plainly gross misinterpretation might, in an appropriate case, support a conclusion that "the arbitrators weren't interpreting the contract at all." *Hill v. Norfolk & W. Ry. Co.*, 814 F.2d 1192, 1194–95 (7th Cir. 1987). As we put it more recently, a court may vacate an arbitration award only when "the arbitrators' interpretation was 'so wacky that it was no interpretation at all.'" *Prostyakov v. Masco Corp.*, 513 F.3d 716, 723 (7th Cir. 2008) (quoting *Tice v. Am. Airlines, Inc.*, 373 F.3d 851, 854 (7th Cir. 2004)).

This heightened degree of deference is essential to enforce the private ordering reflected in the parties' choice to resolve their disputes in arbitration. "[T]he parties have chosen in their contract how their dispute is to be decided, and judicial modification of an arbitrator's decision deprives the parties of that choice." *Tim Huey Corp. v. Global Boiler & Mech., Inc.*, 649 N.E.2d 1358, 1362 (Ill. App. Ct. 1995).

Predictably then, the circumstances under which Illinois courts have been willing to vacate arbitration awards have generally been limited to awards that contain what are essentially calculation errors by the arbitrators. *See First Merit Realty Servs., Inc. v. Amberly Square Apartments, L.P.*, 869 N.E.2d 394 (Ill. App. Ct. 2007); *Shearson Lehman Bros., Inc. v. Hedrich*, 639 N.E.2d 228 (Ill. App. Ct. 1994). Awards

that hinge on an interpretation or application of a particular contract provision have been left undisturbed, even when the arbitrators' interpretation seems bizarre. *See, e.g., Herricane Graphics, Inc. v. Blinderman Constr. Co., Inc.*, 820 N.E.2d 619 (Ill. App. Ct. 2004).

Applying the deferential standard here, I see no basis to vacate this arbitration award. The arbitrators did not exceed their authority in the relevant sense; nothing in the award suggests that their decision wasn't drawn from the contract. The arbitrators resolved this dispute in three separate steps. The panel issued its merits decision on February 21, 2014; denied a motion for reconsideration on June 3, 2014; and awarded attorney's fees on July 15, 2014. In the February decision, the panel rejected Bankers' breach-of-contract claim, focusing mostly on paragraph 19 of the Listing Agreement, which required CBRE to assist Bankers in developing, communicating, negotiating, and presenting offers and counteroffers regarding the Chicago Avenue property. The panel concluded that CBRE could not be liable for the $3.1 million miscalculation in its cost-benefit analysis because the cost-benefit analysis was not an "offer" or "counteroffer" and thus wasn't covered by paragraph 19. Paragraph 20 of the Listing Agreement—the provision requiring CBRE to "answer questions" about offers and counteroffers—was mentioned but not separately analyzed.

Later, in denying reconsideration, the panel acknowledged that paragraph 20 required CBRE to answer Bankers' questions about offers and counteroffers, and this implied a requirement of *accurate* answers. This paragraph, the panel concluded, *does* cover the challenged cost-benefit analysis (the one containing the $3.1 million miscalculation), but

CBRE wasn't liable for breach because the cost-benefit analysis contained a disclaimer warning that the firm wasn't responsible for errors.

That may be an erroneous interpretation of the contract, but the decision is plainly *grounded in* the contract, so we cannot vacate the award. My colleagues say the arbitration panel ignored explicit language in the Listing Agreement and "confused the cost-benefit analyses with the Listing Agreement." Majority op. at 8. I disagree. The arbitrators quoted and construed the relevant language in the agreement (paragraphs 19 and 20) and clearly understood that the cost-benefit analyses were the "answers" required by paragraph 20—the bargained-for performance, not the contract itself. On plenary review I might agree with my colleagues that the arbitrators mistakenly read the disclaimer and the agreement together. But the limited judicial review that the IAA permits requires us to uphold an arbitration decision that "draws [its] essence from the parties' contract," as this one does. *Tim Huey*, 649 N.E.2d at 1364.

Finally, my colleagues have misapplied *Shearson Lehman Brothers*. There the Illinois Appellate Court held that when "arbitrators ma[k]e an evident miscalculation of figures in arriving at the award, the reviewing court will modify or correct the award." 639 N.E.2d at 232. But the arbitration panel did not make a calculation error. The arbitrators concluded that CBRE was not liable; there is no miscalculation to modify or correct. *Shearson Lehman Brothers* does not apply.

Accordingly, however much we might disagree with the arbitrators' reasoning, we cannot vacate the award. I respectfully dissent.