POSNER, Circuit Judge.
A dispute between the parties was referred to a panel of arbitrators, who voted in favor of CBRE, a large real estate company. Its opponent, Bankers, an insurance company, challenged the arbitrators’ decision in federal district court, lost there, and appeals.
In 2011 Bankers leased office space at 600 West Chicago Avenue in Chicago. Its lease was set to expire in 2018. Another tenant in the building was Groupon, the well-known online merchant, which needed more office space. CBRE approached Bankers about the possibility of Bankers’ subleasing its space in the building to Groupon and relocating elsewhere, and Bankers responded to CBRE’s overtures by hiring it to negotiate a sublease to Groupon and find an alternative location for Bankers. Bankers and CBRE signed a Listing Agreement which provided that CBRE would “accept delivery of'and present [to Bankers] all offers and counteroffers to buy, sell, or lease ... property” of Bankers; “would assist [Bankers] in developing, communicating, negotiating, and presenting offers, counteroffers, and notices”; and would “answer [Bankers’] questions relating to the offers, counteroffers, notices, and contingencies.” These terms were required by Illinois law. 225 ILCS 454/15-5(a), 15-75.
Bankers was unwilling to sublease its space at 600 West Chicago Avenue without obtaining a comparable lease elsewhere; moreover, it wanted its revenue from subleasing its space in that building to Grou-pon to exceed the cost of its new lease elsewhere. CBRE agreed, consistently with' its having agreed in the Listing Agreement to present “offers” to Bankers and answer any questions Bankers might have about the offers that CBRE obtained. Bankers told CBRE that it wanted to net $7 million from its deals with Groupon and the lessor of the space that Bankers would obtain to replace the space it would be subleasing to Groupon. The $7 million would be the consequence of the generous income that Bankers would receive from its sublease to Groupon combined with Bankers’ inexpensive relocation elsewhere.
CBRE responded by presenting Bankers with a series of cost-benefit analyses (CBAs), comparing the costs of leasing new space with the benefits of subleasing the old space to Groupon. A CBA delivered by CBRE to Bankers in May 2011 showed a net savings to Bankers from relocating to 111 East Wacker Drive of $6.9 million. As this was within $100,000 of the deal Bankers was seeking, it responded to the information in the CBA by subleasing its West Chicago Avenue space to Groupon and leasing the space on East Wacker Drive for itself.
CBRE’s calculation was inaccurate. It omitted Bankers’ promise, as part of the deal with Groupon, to give Groupon a $3.1 million tenant improvement allowance to enable Groupon to improve the space formerly occupied by Bankers. The uncontra-dicted evidence is that had Bankers known it would profit by only $3.8 million ($6.9 *731 million — $3.1 million) from the deal package (lease plus sublease), it would have rejected the deal and thus not have relocated and CBRE would not have obtained the $4.5 million in commissions that it received as compensation for having arranged the sublease to Groupon and Bankers’ relocation to East Wacker Drive.
The upshot was an arbitration proceeding conducted by Judicial Arbitration and Mediation Services (JAMS), in which Bankers sought to recoup the lost $3.1 million and to avoid having to pay commissions to CBRE because by failing to provide Bankers with accurate information CBRE had violated the Listing Agreement, failed to perform the duties imposed on it by the Illinois Real Estate License Act, and committed the tort of negligent misrepresentation. In February 2014 the arbitration panel issued its award (actually it turned out to be only its first award), ruling that while CBRE had indeed erred in greatly exaggerating the value of the sublease/lease deal that it had arranged for Bankers, it had not violated the Listing Agreement because the agreement did not explicitly require CBRE to furnish Bankers with a correct CBA, and CBRE had not violated its obligations, set forth in the Listing Agreement, to assist Bankers “in developing, communicating, negotiating and presenting offers, counteroffers and notices” and “to answer [Bankers’] questions relating to offers, counteroffers, notices, and contingencies.” Oddly, the panel said that “the mistake in CBRE’s analysis on the summary pages of the CBAs is not a violation of its obligation to assist Bankers ‘in developing, communicating, negotiating and presenting offers[,] counteroffers and notices’ ” nor a failure to “answer [Bankers’] questions relating to offers, counteroffers, notices, and contingencies.” It’s hard to imagine what else the mistake might be. The panel rejected Bankers’ other arguments as well.
Evidently the panel had misgivings. For four months later (June 2014), in response to Bankers’ unsurprising motion for reconsideration of the award, the panel changed course. It now acknowledged “that the Listing Agreement obligated CBRE to answer questions accurately” and that “CBRE [had] made a mistake and that mistake was material.” Yet the panel adhered to its earlier ruling in favor of CBRE, on the ground that “as stated by Bankers, the required answers [to questions Bankers had put to the brokerage firm concerning the sublease to Groupon and the leasing of alternative premises for Bankers] “were the CBAs” (emphasis in original) and “the CBAs ... included a disclaimer that provided that CBRE was not guaranteeing that there were not any errors contained in the CBA. Here, there was an arithmetic error, or an error in aligning the columns of numbers. The disclaimer clearly provides that CBRE was not responsible for errors.”
The next month the panel issued another “final award” (the original award having been downgraded to interim status), again in favor of CBRE, to which it now awarded costs.
The panel exceeded its authority. It was authorized to interpret the contract. The contract did not include the cost-benefit analyses. The panel’s reliance on the disclaimer in the CBAs was therefore unjustified. The disclaimer is not part of the Listing Agreement; it was not negotiated by the parties but merely inserted by CBRE unilaterally. The CBAs — the only places in which the disclaimer appears— not only are not part of the agreement; they are not mentioned in it. They were just the format, the vehicle, in which CBRE responded to Bankers’ inquiries about the progress of the negotiations for the subleasing of Bankers’ space on West Chicago Avenue and the relocation of *732 Bankers to East Wacker Drive. But as such responses — responses to Bankers’ “questions relating to offers, counteroffers, notices, and contingencies” — were inaccurate, they were not responsive, and thus violated the Listing Agreement, which as the panel said in its order required “that ... CBRE ... answer questions accurately”
The arbitrators’ role was to interpret the agreement, not additions to it by one party without the consent of the other— such additions could not amend the agreement. Having belatedly discovered that it had failed to disclaim liability under the Listing Agreement, CBRE should have asked Bankers for a modification of the agreement. Instead it snuck the disclaimer into documents that had not been agreed upon by the parties. It was like Mr. A agreeing in writing to pay Mr. B $10 dollars, and B responding (with hand held out, and palm open): “I have changed $10 to $20.” The arbitrators attempted to amend the contract with a document that was not part of the contract. The district court let them get away with it.
True, an error does not normally invalidate an arbitration award; otherwise such awards would have no greater immunity from judicial review than decisions by district, judges or administrative agencies. The idea is that by electing arbitration the parties have chosen to bypass the judicial system. As we said in Wise v. Wachovia Securities, LLC, 450 F.3d 265, 269 (7th Cir.2006), “when parties agree to arbitrate their disputes they opt out of the court system, and when one of them challenges the resulting arbitration award he perforce does so not on the ground that the arbitrators made a mistake but that they violated the agreement to arbitrate, as by corruption, evident partiality, exceeding their powers, etc. — -conduct to which the parties did not consent when they included an arbitration clause in their contract.” Or as the Illinois Supreme Court said in Garver v. Ferguson, 76 Ill.2d 1, 27 Ill.Dec. 773, 389 N.E.2d 1181, 1183-84 (1979), Illinois courts will not vacate an arbitration award for mere “errors in judgment or mistakes of law” unless “gross errors of judgment in law or a gross mistake of fact” are “apparent upon the face of the award” — which is this case. See also Rank v. Rockford Products Corp., 143 Ill.2d 377, 158 Ill.Dec. 523, 574 N.E.2d 636, 644 (1991), which attributes that rule to the Illinois Uniform Arbitration Act, 710 ILCS 5/12(3), which governs this case because it is a diversity case arising under Illinois law. And similarly in First Merit Realty Services, Inc. v. Amberly Square Apartments, L.P., 373 Ill. App.3d 457, 311 Ill.Dec. 720, 869 N.E.2d 394, 399 (2007), we read that because “arbitrators’ authority is limited by the unambiguous contract language,” they “do not have the authority to ignore the plain language of the contract and to alter the agreement, as the ultimate award must be grounded on the parties’ contract.” And so when “arbitrators ma[k]e an evident miscalculation of figures in arriving at the award, the reviewing court will modify or correct the award.” Shearson Lehman Brothers, Inc. v. Hedrich, 266 Ill.App.3d 24, 203 Ill.Dec. 189, 639 N.E.2d 228, 232 (1994). In this case the arbitrators made, or more precisely endorsed, a $3.1 million miscalculation.
There was a time when commercial arbitration awards contained no reasoning, in order to avoid attracting the scrutiny of judges, who were fiercely hostile to arbitration, which they viewed as a competitor of adjudication. Thomas E. Carbonneau, “Rendering Arbitral Awards with Reasons: The Elaboration of a Common Law of International Transactions,” 23 Columbia Journal of Transnational Law 579, 583-84 (1985); Andermann v. Sprint Spectrum, L.P., 785 F.3d 1157, 1159 (7th Cir.2015). But increasingly parties to arbitration in *733 sist on “reasoned awards.” See Judith Res-nik, “Diffusing Disputes: The Public in the Private of Arbitration, the Private in Courts, and the Erasure of Rights,” 124 Yale L.J. 2804, 2809 (2015); Stephen L. Hayford, “A New Paradigm for Commercial Arbitration: Rethinking the Relationship Between Reasoned Awards and the Judicial Standards for Vacatur,” 66 George Washington L. Rev. 443, 446 and n. 9 (1998). They did in this case, by selecting JAMS to arbitrate; for JAMS requires the award to “contain a concise written statement of the reasons for the Award” unless the parties agree otherwise, which they didn’t in this case.
Because the parties bargained for a reasoned award, reasoning should be part of the “face of the award.” But the award in this case was based on documents outside the parties’ agreement and ignored the agreement itself — the Listing Agreement. Cf. Rank v. Rockford Products Corp., supra, 158 Ill.Dec. 523, 574 N.E.2d at 644. The arbitration panel realized or at least sensed that it had ignored the Listing Agreement when it issued its June revision of the award, but the new reasoning in that revision confused the cost-benefit analyses with the Listing Agreement. The district court should not have upheld the award. Its judgment is therefore reversed and the case remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED