TIM HUEY CORPORATION, d/b/a Huey Forest Products, Plaintiff-Appellant, v. GLOBAL BOILER AND MECHANICAL, INC., Defendant-Appellee.

Fourth District   No. 4—94—0684

Argued February 15, 1995.—Opinion filed May 1, 1995.

Jerry Tice (argued), of Grosboll, Becker, Tice & Smith, of Petersburg, and Roger B. Thomson, of Grosboll, Becker, Tice & Smith, of Havana, for appellant.

Howard W. Feldman (argued) and Charles S. Watson, both of Feldman & Wasser, of Springfield, and Donald O. Pratt (argued) and Paul H. Sanderford, both of Canterbury, Stuber, Pratt, Elder & Gooch, of Dallas, Texas, for appellee.

JUSTICE COOK delivered the opinion of the court:

Plaintiff Tim Huey Corporation, d/b/a Huey Forest Products (Huey), operates a lumber mill in Arenzville, Illinois. In 1988, Huey became interested in developing a cogeneration facility to produce electricity by burning sawdust and other wood waste. The facility would also produce steam to operate kilns used in drying green lumber. Defendant Global Boiler and Mechanical, Inc. (Global), is located in Abilene, Texas. On January 17, 1989, the parties signed a contract whereby Global would design and install a fuel handling system, design and install a firebox and burner system, remove and install a power plant then existing in Minnesota, and interconnect those component parts at Arenzville. Huey was responsible for site preparation, foundations, a building shell for the facility, permits, and purchasing all equipment used in the facility. The amended contract price was $687,175. Global was to complete the project by January 1990.

The contract provided that Global could not recover for extra work unless Huey had signed a written change order. The contract also provided that the circuit court of Cass County, Illinois, constituted the exclusive forum for adjudication of any disputes. The contract provided that it would be governed by and construed in accordance with Texas law, and "any controversy [or] claim arising out of or relating to any agreement resulting from this proposal or breach thereof shall be settled in accordance with the Uniform Arbitration Act, Vernon's Ann. Texas Civil Statutes, articles 224 to 238-6."

Construction of the cogeneration facility was commenced but never completed. Global effectively stopped work in May 1990 after

having been paid $412,516 by Huey. There are indications Global at that point realized it was "in over its head," and that the project could not be completed for anything close to the balance remaining on the contract. Global, however, claimed that Huey had breached the contract by interfering with Global's performance, making it impossible for Global to complete the project. Huey filed suit in the circuit court of Cass County, seeking arbitration. Global removed that suit to the district court for the central district of Illinois, but the district court remanded the case back to the circuit court. The circuit court ordered arbitration in accordance with a submission agreement calling for arbitration by the American Arbitration Association (AAA) pursuant to its construction industry arbitration rules. The AAA chose a panel of three arbitrators.

Huey's expert witness, William Morrow, testified it would cost $1,690,000 to complete the facility, which figure included $286,650 for refurbishing part of the work which had deteriorated since August 1990. Global's expert, Arthur S. McGraw, testified to a cost of completion as of August 1990 of $560,620, or $691,713 including profit and overhead. Reducing those figures by the amount unpaid on the contract ($274,659), Morrow's testimony indicated damages of $1,415,341, and McGraw's testimony indicated damages of $417,054. The arbitrators awarded Huey $161,588 plus $17,340 prejudgment interest (allowed by Texas law), a total of $178,928. Huey was also awarded "the boiler and auxiliary equipment and the piping ducts, transitions, machinery and other property on the Arenzville, Illinois[,] site."

Global had sought compensation of $94,724 for extra work and materials it claimed to have furnished. The most significant extra claimed was the installation and repair of an oil-burning "loaner" boiler which Global had supplied Huey so that Huey could operate its dry kilns pending completion of the cogeneration facility. The arbitrators awarded Global $92,224 on this claim, thereby reducing Huey's net award to $86,704 ($104,044.80 including interest). The arbitrators gave no explanation for their award.

Global filed with the circuit court to confirm the award, and Huey filed seeking vacatur. In an order entered July 6, 1994, the circuit court of Cass County confirmed the award. Huey appeals, contending the trial court should have vacated the damages award and ordered rearbitration, because (1) the arbitrators acted in manifest disregard of the law, (2) the arbitrators exceeded their powers and authority, (3) the award was irrational, arbitrary and capricious, and (4) the award violated public policy by undermining confidence in arbitration. Huey also contends the arbitrators improperly allowed Global

compensation for extras despite Global's failure to comply with the contract provision requiring prior written approval of any change orders.

## II. APPLICABLE LAW

Because the contract involves interstate commerce, the parties are in agreement that the Federal Arbitration Act (Federal Act) (9 U.S.C. § 1 *et seq.* (1988)) controls our review of the validity of the arbitration award, despite their contract provision that any arbitration arising from a contract dispute would be governed by the Texas Uniform Arbitration Act (Texas Act) (Tex. Rev. Civ. Stat. Ann. arts. 224 through 238—2 (West Supp. 1995)). Huey cites *Atlantic Aviation, Inc. v. EBM Group, Inc.* (5th Cir. 1994), 11 F.3d 1276, 1280, and *Northern Illinois Gas Co. v. AIRCO Industrial Gases, a Division of AIRCO, Inc.* (7th Cir. 1982), 676 F.2d 270, 274-75, in support of the proposition that Federal law preempts State law whenever arbitration concerns interstate commerce, notwithstanding any contractual choice of law provision. The grounds for vacating an award under the Texas Act and Federal Act are virtually identical. Both acts state that an arbitration award may be vacated if the arbitrators exceeded their powers. (Tex. Rev. Civ. Stat. Ann. art. 237, at 34 (West 1973); 9 U.S.C. § 10(d) (1988).) However, Huey argues that Federal preemption is significant because the Federal courts have recognized additional nonstatutory grounds upon which an arbitration award may be vacated. "These additional common law standards include the requirement [(1)] that an award cannot be in manifest disregard of the law; [(2)] cannot be irrational, arbitrary, or capricious; and [(3)] cannot be violative of public policy."

We disagree that Federal law governs the grounds for vacatur. None of the preemption cases cited by Huey hold that Federal law preempts State vacatur law. It is true that section 2 of the Federal Act, which provides that written arbitration agreements in contracts "involving commerce" are valid, preempts *conflicting* State law. (*Allied-Bruce Terminix Cos. v. Dobson* (1995), 513 U.S. 265, 270, 130 L. Ed. 2d 753, 761, 115 S. Ct. 834, 837 (Alabama statute made predispute arbitration agreements invalid and unenforceable).) This is because "the basic purpose of the Federal Arbitration Act is to overcome courts' refusals to enforce agreements to arbitrate." (*Allied-Bruce*, 513 U.S. at 270, 130 L. Ed. 2d at 762, 115 S. Ct. at 838; see also *Southland Corp. v. Keating* (1984), 465 U.S. 1, 16, 79 L. Ed. 2d 1, 15-16, 104 S. Ct. 852, 861.) Nevertheless:

"[E]ven when federal law applies to an arbitration agreement, the [Federal Act] has never been construed to preempt all state

law on arbitration. \*\*\* At best, the Supreme Court's decisions support a conclusion that all state laws seeking to *limit* the use of the arbitral process are superseded by federal law." (Emphasis in original.) *New England Energy Inc. v. Keystone Shipping Co.* (1st Cir. 1988), 855 F.2d 1, 4.

See also *Yates v. Doctor's Associates, Inc.* (1990), 193 Ill. App. 3d 431, 437-39, 549 N.E.2d 1010, 1014-15 (and cases cited therein).

■ Enforcing private agreements to abide by State rules of arbitration is fully consistent with the goals of the Federal Act. (*Volt Information Sciences, Inc. v. Board of Trustees* (1989), 489 U.S. 468, 479, 103 L. Ed. 2d 488, 500, 109 S. Ct. 1248, 1255-56.) Therefore, we hold that the Texas Act governs this case. We note the Supreme Court of Illinois has refused to follow Federal cases interpreting the Federal Act in cases where the Illinois Uniform Arbitration Act (Illinois Act) (710 ILCS 5/1 through 23 (West 1992)) applies. *Rauh v. Rockford Products Corp.* (1991), 143 Ill. 2d 377, 390-91, 574 N.E.2d 636, 643.

The parties' written agreement provided that the Texas Act would govern arbitration disputes. Neither Huey nor Global has cited any Texas reviewing court decisions in arbitration cases, but they do cite Illinois cases interpreting the Illinois Act, *i.e.*, the Illinois codification of the Uniform Arbitration Act (Uniform Act) (Uniform Arbitration Act, 7 U.L.A. 5-229 (1985)) promulgated by the National Conference of Commissioners on Uniform State Laws in 1955. Certainly no one has suggested there are any differences between Illinois and Texas law on this subject. We therefore consider Illinois law in deciding this case. (See *Yates*, 193 Ill. App. 3d at 439-40, 549 N.E.2d at 1015-16 (court applied Illinois Act where Federal Act did not preempt it, franchise agreement provided Connecticut law governed arbitration, but parties cited only the Illinois Act and Federal Act).) Since the Illinois Act is to be construed "to make uniform the law of those states which enact it," we would consider the opinions of the courts of other jurisdictions in any case. 710 ILCS 5/20 (West 1992); *Garver v. Ferguson* (1979), 76 Ill. 2d 1, 8, 389 N.E.2d 1181, 1183.

## II. JUDICIAL REVIEW OF ARBITRATION AWARDS

■ The Illinois Act, as with the Uniform Act and the Texas Act, provides for very limited judicial review of an arbitrator's award. (Compare 710 ILCS 5/12, 13 (West 1992), with Uniform Arbitration Act §§ 12, 13, 7 U.L.A. 140-41, 201-02 (1985), Tex. Rev. Civ. Stat. Ann. arts. 237, 238 (West 1973).) The Illinois Act allows, *e.g.*, vacation of an award procured by corruption, fraud, or other undue means, or where

there was evident partiality or misconduct on the part of the arbitrators, or where the arbitrators exceeded their powers. (710 ILCS 5/12(a)(1), (a)(2), (a)(3) (West 1992).) If the arbitrators have acted in good faith, however, the award is conclusive upon the parties. (*Garver*, 76 Ill. 2d at 7-8, 389 N.E.2d at 1183, quoting *Merritt v. Merritt* (1850), 11 Ill. 565, 567.) There is a presumption that the arbitrators did not exceed their authority. (*Rauh*, 143 Ill. 2d at 386, 574 N.E.2d at 641.) No argument is made in this case that the contract did not provide for arbitration or that this case did not fall within the class of cases for which arbitration was required. Arbitration awards should be construed, wherever possible, so as to uphold their validity. (*Rauh*, 143 Ill. 2d at 386, 574 N.E.2d at 641; *Merritt*, 11 Ill. at 567-68.) Such deference is accorded because the parties have chosen in their contract how their dispute is to be decided, and judicial modification of an arbitrator's decision deprives the parties of that choice. " 'A contrary course would be a substitution of the judgment of the Chancellor in place of the judges chosen by the parties, and would make an award the commencement, not the end, of litigation.' " *Garver*, 76 Ill. 2d at 9, 389 N.E.2d at 1184, quoting *Burchell v. Marsh* (1854), 58 U.S. 344, 349, 15 L. Ed. 96, 99.

█ Because the parties did not bargain for the judgment of the courts, a reviewing court cannot set aside an arbitration award because of errors in judgment or mistakes of law or fact. (*Garver*, 76 Ill. 2d at 7, 389 N.E.2d at 1183.) *Garver* indicates that gross errors of judgment in law or gross mistakes of fact may be reviewable if they are apparent upon the face of the award. (*Garver*, 76 Ill. 2d at 10-11, 389 N.E.2d at 1184.) Texas law is in accord: "Not every error of fact or law warrants setting aside an arbitration award, but only those errors that result in a fraud or some great and manifest wrong and injustice." (*Riha v. Smulcer* (Tex. Ct. App. 1992), 843 S.W.2d 289, 294.) This test may be similar to a test employed by some Federal courts, *i.e.*, interpretations of the law by the arbitrators are not reviewable but their manifest disregard of the law is reviewable. See *Wilko v. Swan* (1953), 346 U.S. 427, 436-37, 98 L. Ed. 168, 176-77, 74 S. Ct. 182, 187-88 (disregard of the law must be made "clearly to appear").

█ The "manifest disregard of the law" standard provides an almost nonexistent standard of review. Review under that standard requires that the arbitrator deliberately disregarded what he knew to be the law. (*Eljer Manufacturing, Inc. v. Kowin Development Corp.* (7th Cir. 1994), 14 F.3d 1250, 1254, citing *Health Services Management Corp. v. Hughes* (7th Cir. 1992), 975 F.2d 1253, 1267.) As stated in *Hughes*:

"[T]o vacate an arbitration award for manifest disregard of the law, there must be something beyond and different from mere error in law or failure on the part of the arbitrators to understand or apply the law; it must be demonstrated that the majority of arbitrators deliberately disregarded what they knew to be the law in order to reach the result they did. *Sidarma Societa Italiana Di Armanento Spa, Venice v. Holt Industries, Inc.*, 515 F. Supp. 1302 (D.C.N.Y. 1981), *aff'd*, 681 F.2d 802 (2nd Cir.); *Shearson Hayden Stone, Inc. v. Liang*, 493 F. Supp. 104 (D.C. Ill. 1980), *aff'd*, 653 F.2d 310 (7th Cir.) (Arbitration award may not be vacated for 'manifest disregard of the law,' or as 'fundamentally irrational' unless there was failure to decide in accordance with relevant provisions of law and not mere error in interpretation of law.)" (*Hughes*, 975 F.2d at 1267.)

It is almost impossible to ascertain what an arbitrator knew to be the law, because the arbitrator is not required to give reasons, let alone legal analysis, for his decisions. (*Eljer*, 14 F.3d at 1254.) Even if it could be shown what the arbitrator knew, it would be equally difficult to show that he intentionally disregarded it, as opposed to determining that the principle did not apply in the case before him. One commentator has observed that the manifest disregard standard is virtually impossible to meet and that he is unaware of any cases where an arbitration award was vacated because of the arbitrator's manifest disregard of the law. Randall, *The History, Application, and Policy of the Judicially Created Standards of Review for Arbitration Awards*, 1992 B.Y.U. L. Rev. 759, 766 n.43 (hereinafter Randall).

The same author observes that the "irrational, arbitrary, or capricious" test, and similar tests applied by the Federal courts, are but variations of the "essence of the contract" standard set out in *United Steelworkers of America v. Enterprise Wheel & Car Corp.* (1960), 363 U.S. 593, 597, 4 L. Ed. 2d 1424, 1428, 80 S. Ct. 1358, 1361:

"[A]n arbitrator is confined to interpretation and application of the collective[-]bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it *draws its essence from* the collective[-]bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." (Emphasis added.)

See Randall, 1992 B.Y.U. L. Rev. at 762-63.

The Illinois Act's provision that an arbitration award must be vacated if the arbitrators exceeded their powers, and the supreme court's statement in *Garver*, based on that provision, that the arbitrators' errors must be apparent upon the face of an award, are similar

to the idea that awards must draw their essence from the parties' contract. Even under the "essence of the contract" standard, however, arbitration decisions are held insulated from judicial review because the parties bargained for the arbitrator's view of the facts and meaning of the contract; the fact that the arbitrator misread the contract establishes no ground upon which the award can be set aside. *United Paperworkers International Union v. Misco, Inc.* (1987), 484 U.S. 29, 38, 98 L. Ed. 2d 286, 299, 108 S. Ct. 364, 370-71.

Some Federal courts do state that an arbitration award may be vacated if it is arbitrary and capricious. (*Ainsworth v. Skurnick* (11th Cir. 1992), 960 F.2d 939, 941, *cert. denied* (1993), 507 U.S. 915, 122 L. Ed. 2d 665, 113 S. Ct. 1269; *Brown v. Rauscher Pierce Refsnes, Inc.* (11th Cir. 1993), 994 F.2d 775, 779.) If that rule were actually applied, we would review arbitration awards much the same as we do decisions of the trial court. (See *People v. Illgen* (1991), 145 Ill. 2d 353, 364, 583 N.E.2d 515, 519 (abuse of discretion where trial court's decision is "arbitrary, fanciful or unreasonable").) However, judicial review of an arbitrator's award is more limited than appellate review of a trial court's decision. *Garver*, 76 Ill. 2d at 8, 389 N.E.2d at 1183, citing *Bernhardt v. Polygraphic Co. of America, Inc.* (1956), 350 U.S. 198, 203, 100 L. Ed. 199, 205, 76 S. Ct. 273, 276.

Huey would have this court vacate the present award because of alleged errors by the arbitrators. Huey argues the damages award was clearly insufficient, because Global admitted in its post-arbitration brief that if Global were found to be in breach, the cost to complete the cogeneration facility would provide the correct measure of damages. Global further admitted that it would cost at least $417,054 to complete the facility. (Global's estimate was the cost to complete the facility at the time it walked off the work site, so Global's $417,054 figure should not be reduced on account of Huey's later failure to protect the work.) Huey asserts that an award of only $178,928 in damages is inconsistent with the arbitrators' implicit determination that Global breached the construction contract. Finally, Huey argues the arbitrators exceeded their authority when they awarded Global $92,224 for extra work, despite the contract provision stating Global waived all right to compensation unless Global submitted written change orders.

We see no principled way to inject ourselves into this case, to correct an award of damages we suspect is insufficient, where the parties have exercised their right to select an alternate forum. That is not to say that we are satisfied with the arbitrators' award in this case. If a jury had made this award, we might well reverse it. A new trial is appropriate when the damages awarded are manifestly inade-

quate, it is clear proved elements of damages have been ignored, or the amount awarded bears no reasonable relationship to the loss suffered by the plaintiff. (*Hollis v. R. Latoria Construction, Inc.* (1985), 108 Ill. 2d 401, 407, 485 N.E.2d 4, 6.) We should not concoct some reason to review arbitration awards we do not like, however, at the same time stating that we will not set aside an award because of errors in judgment or mistakes of law or fact. We cannot say that this award was made in bad faith, that the arbitrators were guilty of fraud, or that the arbitrators clearly chose not to follow the law.

Of all the cases cited by the parties, the case most like the present one is *Garver.* In *Garver*, an owner (by profession an architect) entered into an agreement with a contractor to construct his home for $45,669. The owner determined the work was not being done according to specifications, evicted the contractor from the jobsite, and finished the work for $59,222. The contractor claimed he was due $45,000 on the contract, but the owner claimed he (the owner) was due $18,211.30, the amount by which his total construction costs exceeded the contract price. The arbitrators, without explanation, awarded the contractor $26,400, a figure close to what would have been awarded if the arbitrators had ruled in favor of both the owner and the contractor. The appellate court found that the arbitrators exceeded their power and did not arbitrate on the basis of the contract. The supreme court reversed. The supreme court noted that if the contractor substantially violated the contract it was properly terminated by the owner, and the contractor would be responsible for the cost of completion. However, "[t]he evidence produced by both parties on the issue of whether [the contractor] substantially violated the contract was capable of more than one interpretation." (*Garver*, 76 Ill. 2d at 10, 389 N.E.2d at 1184.) It is difficult to understand why the arbitrators in *Garver* awarded the contractor only $26,400 if they thought the owner was at fault, and it would appear the owner should have received $18,211.30 if he was not at fault. Nevertheless, the supreme court sustained the award. "Applying this standard, we cannot say that the arbitrators in rendering their award unfairly interpreted the contract." *Garver*, 76 Ill. 2d at 10, 389 N.E.2d at 1184.

In the present case as well, it is difficult to understand why the arbitrators awarded Huey less than the cost to complete the contract if they believed Global was in breach. Perhaps the arbitrators believed Huey was partially responsible for the breach and reduced Huey's damages accordingly. Whether such a reduction in damages was proper is irrelevant; courts do not vacate arbitration awards for mere error. Huey argues that allowing payment for extras without a written change order clearly violated the express terms of the

contract, but such provisions may be waived, and the arbitrators may have so found. See *Union Building Corp. v. J&J Building & Maintenance Contractors, Inc.* (Tex. Civ. App. 1979), 578 S.W.2d 519, 521.

Huey argues, however, that courts do vacate arbitration awards that violate public policy. Huey contends that affirming this clearly erroneous award would violate public policy, because to do so would undermine public confidence in arbitration and thus discourage people from using arbitration to settle their disputes. Illinois and Federal courts will not enforce an arbitration award that violates a well-defined and dominant public policy, as ascertained " ' "by reference to the laws and legal precedents and not from general considerations of supposed public interests." ' " (*Department of Central Management Services v. American Federation of State, County & Municipal Employees* (1993), 245 Ill. App. 3d 87, 93-94, 614 N.E.2d 513, 517, quoting *W.R. Grace & Co. v. Local Union 759* (1983), 461 U.S. 757, 766, 76 L. Ed. 2d 298, 307, 103 S. Ct. 2177, 2183, quoting *Muschany v. United States* (1945), 324 U.S. 49, 66, 89 L. Ed. 744, 756, 65 S. Ct. 442, 451.) Unlike the other grounds for vacatur relied upon by Huey, which derive from the doctrine that an arbitration award must draw its essence from the contract, the public policy exception is rooted in the common law doctrine that a court may refuse to enforce a contract that violates public policy. *Central Management,* 245 Ill. App. 3d at 93, 614 N.E.2d at 517; *United Paperworkers International Union v. Misco, Inc.* (1987), 484 U.S. 29, 42, 98 L. Ed. 2d 286, 301, 108 S. Ct. 364, 373 (reinstatement of employee who used drugs and operated dangerous machinery did not violate an explicit public policy).

Huey's argument is that arbitration does not work well without judicial review, and that we should strain to find the arbitrators exceeded their powers in this case, in order to prevent arbitration from falling into disrepute. If expanded judicial review is appropriate, however, that review should be provided for by the parties in their contract or by the legislature. It is unclear that tacking judicial review onto a proceeding which does not require a record, adherence to principles of law, findings of fact, judges with legal training, or a reasoned decision, would be helpful or possible. It is not possible to have the assumed speed and inexpense of arbitration along with the fairness of court adjudication. We reject the argument that public policy provides any reason in this case for relieving a party from his contractual choice.

According to the United States Supreme Court, the basic purpose of the Federal Act is to overcome courts' refusals to enforce agreements to arbitrate. These refusals are attributed to jealousy on the

part of the courts, an unwillingness to share any power. (*Allied-Bruce Terminix*, 513 U.S. at 270-71, 130 L. Ed. 2d at 762, 115 S. Ct. at 838.) There may be more to it than that. At least three States hold all predispute arbitration agreements unenforceable, and other States refuse to enforce particular classes of such agreements. *Allied-Bruce Terminix*, 513 U.S. at 295, 130 L. Ed. 2d at 777, 115 S. Ct. at 850 (Thomas, J., dissenting, joined by Scalia, J.).

> "[W]here arbitration is contemplated the courts are not equipped to provide the same judicial review given to structured judgments defined by procedural rules and legal principles. Parties should be aware that they get what they bargain for and that arbitration is far different from adjudication." (*Stroh Container Co. v. Delphi Industries, Inc.* (8th Cir. 1986), 783 F.2d 743, 751 n.12.)
> "The present day penchant for arbitration may obscure for many parties who do not have the benefit of hindsight that the arbitration system is an inferior system of justice, structured without due process, rules of evidence, accountability of judgment and rules of law." *Stroh*, 783 F.2d at 751 n.12.

For the foregoing reasons, the order of the circuit court of Cass County, confirming the arbitrators' award and denying the motion to vacate, is affirmed.

Affirmed.

LUND and STEIGMANN, JJ., concur.