2020 IL App (1st) 200084-U

SIXTH DIVISION
October 30, 2020

No. 1-20-0084

NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| POWER CONSTRUCTION COMPANY, LLC, and STEADFAST INSURANCE COMPANY, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | No. 19 L 10874 |
| MICHELS CORPORATION, | ) ) ) | Honorable Patrick J. Sherlock, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Harris and Griffin concurred in the judgment.

**ORDER**

¶ 1   *Held*: The judgment of the circuit court confirming the arbitration award in favor of plaintiff is affirmed where defendant failed to establish a gross error on the face of the award.

¶ 2   In this challenge to an arbitration award resolving construction litigation, Power Construction Company, LLC, the general contractor for a multistory apartment building in Chicago's River North neighborhood, and its insurer, Steadfast Insurance Company (collectively Power), sued Michels Corporation (Michels), the subcontractor in charge of installing caissons for

the project. Power alleged that Michels failed to complete its work on time, causing a four-month delay in the building's construction, and that this delay entitled Power to damages under the parties' contract. Pursuant to that contract, the parties submitted their dispute to binding arbitration.

¶ 3    The arbitrators agreed with Power that Michels had breached its contract by failing to complete its work on time and, in a 17-page decision, set out in detail their reasons for awarding Power compensatory damages, interest, fees, and costs. Concluding, however, that Michels was entitled to compensation for its completed work on the project, the arbitrators reduced the award in favor of Power from $3.7 million to $2.3 million.

¶ 4    Power asked the circuit court to affirm the arbitration award and enter judgment in its favor under section 5/11 of the Uniform Arbitration Act (Act) (710 ILCS 5/11 (West 2018)). Michels, in turn, moved to partially vacate the award, claiming the arbitrators exceeded their authority by committing a gross error of law that was apparent on the face of the award. Following briefing and a hearing, the circuit court confirmed the arbitration award and entered judgment for Power.

¶ 5    On appeal, Michels argues that this court should reverse the circuit court's judgment and vacate the arbitrators' award. If we find that outright reversal is not warranted, Michels argues that we should at least vacate the arbitrators' award of attorney fees and subcontractor acceleration costs.

¶ 6    For the following reasons, we affirm the judgment of the circuit court.

¶ 7                                    I. BACKGROUND

¶ 8    In 2013, Power began construction on a 35-story residential apartment tower at 845 North State Street in Chicago (the Project). Power was the Project's general contractor under a contract with its owner, Tower Ten Glades, LCC (Owner). Power entered into a subcontract with Michels for the installation of caissons on the Project. The subcontract consisted of two parts: a Master

Agreement, dated April 30, 2013, governing the overall business and legal relationship between Power and Michels, and a Project Specific Agreement, dated September 4, 2013, through which Power specifically retained Michels to perform the caisson installation.

¶ 9     The installation of caissons, which are drilled concrete piers and shafts used in the foundations of buildings, was a "critical path activity," meaning Michels needed to complete it before the Project could proceed. Power hired Michels to install 49 caissons for which it was to be paid $1.4 million, and the parties agreed that Michels would complete its work by October 22, 2013.

¶ 10     While performing its work, however, Michels encountered unexpected obstacles, including underground boulders and hydraulic problems with its drilling rig. After various attempts to proceed despite these challenges, the Project's geotechnical engineer and structural engineer of record designed a workaround. Instead of installing two of the larger caissons, Michels would install four smaller caissons. During installation of the four smaller caissons, however, it was discovered that the soil in that area had been overly disturbed by the attempts to remove the boulders and proceed without a full workaround. The area would require remediation through a technique called micropiling. Because micropiles of the type required had never been used in the City of Chicago, design and review of the micropiling plan took approximately a month and a half. Power sought proposals for the micropiling, and Michels submitted a bid. Though Michels submitted a lower and more inclusive bid, Power retained another subcontractor that had considerable experience in this area and a history of past work with the City. While this process was ongoing—and with its contracted-for work completed—Michels demobilized from the Project in November 2013. Overall, the issues encountered during caisson construction delayed completion of the Project by four months.

¶ 11    On August 6, 2014, Power sent Michels a letter invoking remedies under the Master Agreement for the delay, stating that the letter was "Power's formal notice and demand for remedy as Michels ha[d] failed to meet certain performance and financial expectations." And on June 20, 2017, Power filed a complaint against Michels in the circuit court of Cook County asserting common law claims of breach of contract, equitable subrogation, and equitable contribution.

¶ 12    Michels moved to stay the circuit court proceedings and compel arbitration under Article 14C of the Master Agreement, which provided that the parties agreed to arbitrate any disputes arising between them "in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association." The Master Agreement also provided that the arbitrators' award would be final and judgment could be entered upon it "in accordance with applicable law in any court of competent jurisdiction." Power agreed to arbitrate, the circuit court action was stayed, and the matter proceeded to arbitration.

¶ 13    Central to the parties' dispute were the following contractual provisions. First, Article 8 of the Master Agreement made clear that timely progress and completion of the Project was of the essence. That article provided:

"Time is of the essence of the Contract. Subcontractor shall begin its Work promptly following reasonable notice from General Contractor, and shall prosecute such Work diligently and in coordination and cooperation with other subcontractors and other Work on the Project, and shall, at all times, expedite its Work so as to permit the earliest completion of the Project. Subcontractor shall perform its Work in strict accordance with any progress schedule prepared and maintained by General Contractor and shall otherwise perform its work in such sequence and at such rate of progress as, in the sole judgment of General Contractor, is necessary to achieve earliest possible completion of the entire

4

Project with emphasis on those portions of the Project which General Contractor deems most urgent. Subcontractor further agrees that, if it delays the progress of its Work so as to cause any damage or penalty for which General Contractor shall become liable, Subcontractor shall promptly, on demand, reimburse General Contractor for any such amount."

¶ 14    Article 9, Section B, titled "Progress Schedule," specifically addressed subcontractor delays:

"General Contractor has contracted to complete the Project by [See Project Specific Agreement]. In accepting this Contract, Subcontractor agrees that it will perform its Work so as to permit completion as rapidly as possible, but in no event later than said date. If Subcontractor falls behind in performance of its Work, or otherwise causes delay to the Project, it shall be deemed to be in default hereunder and General Contract shall be entitled to pursue its remedies as hereinafter provided in Article 15 below."

¶ 15    Under Article 15, titled "Default by Subcontractor," those remedies included: (1) withholding payment until the default was cured and, if it was not cured, applying any balance owed to the subcontractor to the general contractor's losses; (2) requiring the subcontractor, at its own expense, to make up for the delay; (3) requiring the subcontractor to pay for any remedial work the general contractor "deem[ed] expedient," within 45 days of the default, plus an additional 15% of such costs as "administrative burden"; (4) terminating the contract and taking over the work and materials without waiving or releasing any rights or remedies against the subcontractor; and (5) "recover[ing] from Subcontractor all losses, damages, penalties, and fines, whether liquidated or unliquidated, direct or consequential, and all costs, such as extended overhead, and expenses (including attorney's fees and court costs) suffered or incurred by General Contractor as

a result of Subcontractor's default, including but not limited to extended overhead." Section 15 provided that these remedies were in addition to any other remedies available to Power.

¶ 16    Under Article 7, Section C, titled "Payments," Michels also agreed to indemnify and hold Power harmless against claims made on its subcontractor default insurance that arose out of Michels's work. That indemnification could be "against any loss, liability, damage, costs and expenses of every kind and description, including but not limited to title insurance costs and expenses, costs of special endorsements, and court costs and attorney's fees, sustained or incurred by reason thereof."

¶ 17    Finally, Article 16, titled "Termination for Convenience," stated:

"General Contractor shall have the right to terminate, for convenience, Subcontractor's performance of all or a part of the subcontract work by providing Subcontractor with a written notice of termination for convenience to be effective upon receipt by Subcontractor. If there has been a termination of General Contractor's contract with the Owner, Subcontractor shall be paid the amount due from the Owner for its work as provided in the Contract Documents but only after payment therefor has been made by Owner to General Contractor. If General Contractor's contract has not been terminated, Subcontractor shall be paid the reasonable value of work performed by Subcontractor prior to termination plus reasonable direct close-out costs, but, in no event, shall Subcontractor be entitled to unabsorbed overhead or anticipatory profit. If no work has been performed by Subcontractor at the time of termination, Subcontractor shall be paid the sum of $100.00 in full and complete satisfaction for its undertakings and obligations under this contract."

¶ 18    The arbitrators reviewed these contract provisions and other evidence provided by the parties during a five-day arbitration hearing. The arbitrators found that Michels breached the

contract by failing to complete the caisson work by the agreed-upon completion date. Although the arbitrators considered extensive testimony and documentary evidence in reaching their decision, the Master Agreement, Project Specific Agreement, and final arbitration award were the only items made available to the circuit court and are thus the only items contained in the record on appeal.

¶ 19    The arbitrators explained that, though Michels requested a change order for removal of obstructions, it neither stated the obstructions caused delay nor sought a contractual extension for the required workaround. Therefore, the arbitrators did not find a basis for adjusting the agreed completion date set in the Project Specific Agreement. Although the arbitrators recognized that Michels clearly intended to complete its work on time and, for the most part, acted reasonably, because Michels did not complete the caisson work by the agreed-upon date, the arbitrators found that Michels breached the contract and Power was entitled to damages and other remedies under Article 15 of the Master Agreement.

¶ 20    Addressing Michels's arguments, the arbitrators first found that Michels's assertion that an error in the geotechnical engineer's report required Michels to abandon work on one of the two larger caissons was unfounded. They also disagreed with Michels's argument that Power could not prove that its acceleration costs were a result of Michels's delay in completion of its own "critical path activity." Michels had also claimed that Power failed to mitigate damages, but the arbitrators found that Power acted reasonably to mitigate its damages after the delay. Finally, the arbitrators stated that Power issued an August 6, 2014, letter to Michels to trigger insurance coverage, not to notify Michels of any curable default. Because Michels's delay was incurable as soon as it occurred, the arbitrators found the letter to be "of no consequence to the issues of Michels' liability or damages."

¶ 21    Based on these findings, the arbitrators awarded Power compensatory damages based on what Power had to pay other subcontractors to either accelerate or delay their own work as well as interest, attorney fees, and costs. The arbitrators concluded, however, that Michels should be paid for its completed work under the Master Agreement and Project Specific Agreement. Power's final award, after accounting for the payments due to Michels, was $2.3 million.

¶ 22    In the circuit court, Power filed an application to confirm the arbitrators' award and enter judgment under Section 5/11 of the Act. 710 ILCS 5/11 (West 2018). Michels moved to partially vacate the award.

¶ 23    On December 16, 2019, after briefing by the parties, the circuit court confirmed the arbitrators' award. The court explained that judicial review of arbitration awards is extremely limited. It was required to uphold the award unless there was a gross error of law or fact apparent on its face. The court found that Michels did not meet its burden of showing such an error and confirmed the award. The court emphasized that it did not have access to the records from the arbitration proceedings and that it was improper to second-guess the arbitrators' judgment absent an error on the face of the final award. This appeal followed.

¶ 24                                    II. JURISDICTION

¶ 25    The circuit court's final order granting Power's motion to confirm the arbitration award and denying Michels's motion to vacate the award in part was entered on December 16, 2019. Michels filed a timely notice of appeal from that order on January 10, 2020. Appeals from such orders are taken "in the same manner, upon the same terms, and with like effect as in civil cases" 710 ILCS 5/18 (West 2018). Accordingly, this court has jurisdiction pursuant to Illinois Supreme Court Rules 301 and 303, governing appeals from final judgments entered by the circuit court in civil cases. Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); R. 303 (eff. July 1, 2017).

8

¶ 26                                    III. ANALYSIS

¶ 27     Our review of an arbitration award is, by design, extremely limited. *American Federation of State, County & Municipal Employees, AFL-CIO v. State*, 124 Ill. 2d 246, 254 (1988). As our supreme court has emphasized, "arbitration awards should be construed, wherever possible, so as to uphold their validity." *Rauh v. Rockford Products, Corp.*, 143 Ill. 2d 377, 386 (1991) (citing *Merritt v. Merritt*, 11 Ill. 565, 568 (1850)). This is out of respect for the power of parties contracting at arm's length to select their preferred method for resolving disputes that may arise between them. *Tim Huey Corp. v. Global Boiler and Mechanical, Inc.*, 272 Ill. App. 3d 100, 106 (1995). As our supreme court has long made clear:

> "[a]rbitrators are judges chosen by the parties to decide the matters submitted to them, finally and without appeal. As a mode of settling disputes [arbitration] should receive every encouragement from the courts of equity. If the award is within the submission, and contains the honest decision of the arbitrators, after a full and fair hearing of the parties, a court of equity will not set it aside for error either in law or fact. A contrary course would be a substitution of the judgement of the Chancellor in place of the judges chosen by the parties, and would make an award the commencement, not the end, of litigation." *Garver v. Ferguson*, 76 Ill. 2d 1, 9 (1979) (citing *Burchell v. Marsh*, 58 U.S. 344, 349 (1854)).

¶ 28     The limited instances when a court may vacate an arbitration award under the Act include: when "[t]he award was procured by corruption, fraud, or other undue means"; when there was "evident partiality" or "misconduct prejudicing the rights of any party" by the arbitrators; when the arbitrators exceeded their powers; when the arbitrators substantially prejudiced the rights of one party by inappropriately refusing to postpone or hear material evidence; or when there was, in fact, never a valid agreement to arbitrate. 710 ILCS 5/12(a) (West 2018). Our review of the

decision of the circuit court is *de novo,* as only its legal conclusions are at issue. *Herricane Graphics, Inc. v. Blinderman Construction Co., Inc.*, 354 Ill. App. 3d 151, 157 (2004)

¶ 29    On appeal, Michels argues that the circuit court erred in confirming the arbitrators' final award because it was apparent on the face of that award that the arbitrators had exceeded their powers by substituting their judgment for the language of the parties' Master Agreement. In particular, Michels argues that Articles 15 and 16 of the parties' Master Agreement were mutually exclusive—either (1) Michels was terminated for convenience under Article 16, was owed payment for the work it had performed thus far, and Powers was never entitled the Article 15 remedies or (2) Michels was terminated for cause, in which case Power's late notice of default barred it from asserting the Article 15 remedies. Additionally, even in the absence of termination, if the arbitrators believed that Michels had breached the contract, Michels argues that Power's notice of default letter was issued improperly and thus prohibited Power from recovering damages. The arbitrators' decision to disregard Power's purported notice of default letter, award Powers damages under Article 15, and still compensate Michels for the work it performed was—Michels insists—simply not a plausible reading of the parties' contract.

¶ 30    "[G]ross errors of judgment in law or gross mistakes of fact may be reviewable" as instances of arbitrators exceeding their power but only if "they are apparent upon the face of the award." *Huey*, 272 Ill. App. 3d at 106 (citing *Garver*, 76 Ill. 2d at 10–11). The challenging party has the burden of proving such an error occurred (*Wilcox Co. v. Bouramas*, 73 Ill. App. 3d 1046, 1052–53 (1979)), and must overcome a presumption that the arbitrators acted within their authority (*Rauh*, 143 Ill. 2d at 386 (citing *Darst v. Collier*, 86 Ill. 96, 100 (1877))).

¶ 31    In the specific context of a contract dispute, the challenging party must show that "all fair and reasonable minds would agree that the construction of the contract made by the arbitrator was

not possible under a fair interpretation of the contract." (Internal quotation marks omitted.) *Garver*, 76 Ill. 2d at 9–10. The question is not whether an arbitrator's interpretation is the right one but "whether the construction of the contract made by the arbitrator *is a reasonably possible one* that can seriously be made in the context in which the contract was made." (Emphasis added.) *Garver*, 76 Ill. 2d at 9.

¶ 32    In *Garver*, a case with some similarities to this one, an architect hired contractors to build a house on a plot of land he owned. Disputes arose, the parties submitted those disputes to binding arbitration per their agreement, and the arbitrators entered an award in favor of the contractors. *Id.* at 3–6. The circuit court rejected the architect's challenge to the award, but the appellate court held that the arbitrators "exceeded their power and did not arbitrate on the basis of the contract." *Id.* at 6. Our supreme court disagreed. *Id.* at 10. In reversing the appellate court, the court cited a "long line of cases" establishing that arbitration awards should not be vacated for mere errors in judgment or mistakes of law or fact. *Id.* at 7. It emphasized that the evidence the arbitrators had considered was "copious and technical" and thus open to more than one reasonable interpretation. *Id.* at 10. Because the court was bound to uphold the validity of the award unless, on the face of the award, there were gross errors of judgment in law or fact, the court affirmed the arbitration award. *Id.* at 10–11.

¶ 33    Here, as in *Garver*, the parties undisputedly agreed both to arbitrate their future disputes and that any arbitration award would be final. And here, as in *Garver*, the arbitrators were called upon to review breach of contract claims involving highly technical construction matters that could be open to more than one reasonable interpretation. They did so based on an evidentiary record that is not before us and was not before the circuit court. The *Garver* court recognized that established case law encourages upholding arbitration awards under these circumstances. When,

11

as in *Garver*, a contract is reasonably open to more than one interpretation and the arbitrators act in good faith, "the award is deemed conclusive upon the parties." *Advocate Financial Group v. Poulos*, 2014 IL App (2d) 130670, ¶ 50.

¶ 34    For the arbitrators to have acted in good faith does not require a reviewing court to agree with the arbitrators' decision; the decision must simply be a reasonable one. *Huey*, 272 Ill. App. 3d at 108–09. In *Huey*, the appellate court cited *Garver* to explain that if parties have contractually chosen a dispute resolution forum, when their chosen judges review a complicated record and reach a decision, that decision need not be the only possible outcome, the most reasonable interpretation, or the conclusion that the court itself would have reached. *Id.* at 109–10. Thus, even if we disagreed with the arbitrators' interpretation of the parties' contracts, in accordance with *Garver,* courts do "not vacate arbitration awards for mere error." *Id.* at 109. For the reasons that follow, however, we in fact find the arbitrators' award to be quite well reasoned.

¶ 35    The arbitrators' decision interpreted the contract differently than Michels, who contends that Articles 15 and 16 of the parties' Master Agreement were mutually exclusive—either (1) Michels was terminated for convenience under Article 16, was owed payment for the work it had performed thus far, and Powers was never entitled the Article 15 remedies or (2) Michels was terminated for cause, in which case Power's late notice of default barred it from asserting the Article 15 remedies. The arbitrators did not see Article 16 as relevant since it did not view this as a case involving *any* sort of termination. They noted that, "other than the micropiles, which were not in its original scope," "Michels demobilized from the Project because its work was complete." Although the arbitrators referred to Power's August 6, 2014, letter as the "Letter of Default," the arbitrators made clear that the letter "was sent in order to trigger Subguard insurance coverage rather than to notify Michels of any need to perform further work." A notice of default with the

opportunity to cure, after the work was completed and resulting delays had already occurred was, in the arbitrators' view, "unnecessary and ineffectual."

¶ 36    The arbitrators could have reasonably concluded that Power was entitled to Article 15 remedies, despite the fact that Michels had not been terminated for cause. Article 9B of the Master Agreement provided that, if Michels fell behind in its work or otherwise caused delays, Michels would be "deemed to be in default" and Power would "be entitled to pursue its remedies as hereinafter provided in Article 15." Power also points to Article 7C—which stated that Michels would indemnify and hold Power harmless against claims on its subcontractor default insurance if those claims arose out of Michels's work—and Article 8—in which Michels agreed to reimburse Power for any amount related to Michels's delay of the Project—as potential legal bases for the arbitrators' decision. Given these other provisions, and because Michels does not deny that in failing to complete the caisson work on time it delayed the Project, Michels has failed to demonstrate that "all fair and reasonable minds would agree that the construction of the contract made by the arbitrator was not possible." (Internal quotation marks omitted.) *Garver*, 76 Ill. 2d at 9–10.

¶ 37    Michels cites *Shearson Lehman Brothers, Inc. v. Hedrich*, 266 Ill. App. 3d 24 (1994), and *First Merit Realty Services, Inc. v. Ambery Square Apartments, L.P.*, 373 Ill App. 3d 457 (2007), for the proposition that an award must be vacated where arbitrators ignore the plain and unambiguous terms of a contract and implement their own notion of what is fair. This case is nothing like *Shearson* or *First Merit*. In *Shearson*, the arbitrators awarded the Shearson employees arbitrary lump sums, rather than amounts due under the clear and unambiguous mathematical formulas in the parties' deferred compensation agreements. 266 Ill. App. 3d at 29. In *First Merit*, the arbitrators considered parol evidence of an oral agreement, relying on it instead of on the clear

13

and unambiguous language of the parties' written agreements. 373 Ill. App. 3d at 464. In contrast, in this case the arbitrators adopted a reasonable—if not the only reasonable—interpretation of the Master Agreement.

¶ 38     Michels also insists that a notice of default from Power was a condition precedent to a claim that Michels breached the parties' contract. Michels insists that the lateness of Power's August 6, 2014, letter deprived Michels of the opportunity to cure its breach. But as the arbitrators concluded, it was the delay itself—and not the workmanship—that was the problem. There was simply no way for Michels to make up for a four-month delay in the overall progress of the Project. As Power correctly notes, the Article 15 notice provision "only exist[ed] to allow the subcontractor to cure workmanship defaults for which there would be an opportunity to cure." *Sloan Electric v. Professional Realty & Development Corp.*, 353 Ill. App. 3d 614 (2004), relied on by Michels, is distinguishable in this regard, as it involved a dispute over unsatisfactory workmanship. Here, Article 9B of the Master Agreement clearly stated that if Michels caused delays, it would "be deemed to be in default," entitling Power to Article 15 remedies.

¶ 39     As an alternative argument, Michels urges us to vacate a portion of the award on the grounds that Power failed to mitigate its damages after the delay. A plaintiff has a duty to mitigate damages it "might have avoided with reasonable effort without undue risk, expense, or humiliation." *Pioneer Bank & Trust Co. v. Seiko Sporting Goods, Co.*, 184 Ill. App. 3d 783, 790 (1989). As the breaching party, Michels bore the burden of proving that Power acted unreasonably. However, in seeking to meet that burden, it could not simply assert that Power should have acted in a way that Michels deemed wiser, or in a way that would have been more helpful to Michels. *Id.* at 790–91 (noting that a breaching party must refrain from making a "hypercritical examination of the injured party's conduct").

14

¶ 40    As the general contractor, Power's contract with the Owner provided that, after a one-month grace period, Power would pay liquidated damages not to exceed $1.2 million if it failed to complete the Project on time. Michels's argument is that it was unreasonable for Powers to pay what turned out to be significantly more than this—$2.7 million, in total, to compensate various other subcontractors to stand by until needed or for the completion of their work at an accelerated pace—to avoid paying the capped liquidated damages.

¶ 41    The arbitrators viewed this as "a complex issue" for which neither party had submitted any directly controlling authority. They also noted that, when Power made the decision to accelerate and try to complete the project within the grace period, it did not yet know what the total cost for doing so would ultimately be. The arbitrators also understood that more was at stake for Power than just a loss on the Project. They found "Power's decision to accelerate the subsequent work to minimize the delays to be reasonable" because "a general contractor like Power depends to a large extent on its reputation for timely completing projects." The arbitrators also noted that a "trust and confidence" provision in Power's agreement with the Owner "established duties on Power that [were] akin to fiduciary duties, which arguably required Power to put the Owner's interests ahead of its own and to incur acceleration costs that were greater than the cap on liquidated damages." Michels had, in the arbitrators' view, pointed to no authority requiring Power to put Michels's interests ahead of the Owner's.

¶ 42    Michels also argues that it and other subcontractors had what Michels refers to as "no-damages-for-delay" clauses in their contracts that should have prevented Power from recovering acceleration costs from those subcontractors. Michels points to a provision in its own Master Agreement stating: "Subcontractor agrees that, in the event it incurs any additional costs or expenses because it is required to furnish additional crews and/or to work its personnel overtime,

15

it will not seek any additional compensation for said costs or expenses from General Contractor." In Michels's view, this clause, which it argues is similar to clauses found in the other subcontractors' contracts, means that Power was not contractually obligated to pay acceleration costs—the implication being that it was therefore automatically unreasonable for it to do so. The arbitrators addressed this directly. The award noted that no subcontractors "present[ed] delay claims to Power," and Power instead voluntarily compensated subcontractors for accelerating—a course of conduct the arbitrators found to be reasonable under the circumstances, since the subcontractors would not have accelerated their work to make up for Michels's delay without additional payment. One subcontractor, McHugh, was paid to wait to begin its work, but McHugh's contract, according to the arbitrators, did not contain a no-damages-for-delay clause and specifically provided for the compensation that subcontractor received. Michels points to nothing in this record that contradicts this conclusion.

¶ 43 In sum, nothing on the face of the arbitration award or in this record supports any of Michels's arguments that Power failed to mitigate. It was Michels's obligation, as the party challenging the arbitration award, to present such support to the circuit court and to this court on appeal. It is well settled that any "doubts which may arise from the incompleteness of the record will be resolved against the appellant." *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984).

¶ 44 Michels also urges us to find that the arbitrators improperly awarded attorney fees to Power. Power argues that Michels forfeited this argument by raising it only in passing in the circuit court and making no effort to fully develop the argument until this appeal. We are disinclined to find forfeiture under these circumstances (see *Pennymac Corp. v. Jenkins*, 2018 IL App. (1st) 171191, ¶ 23 (forfeiture is a limit on the parties and not on the appellate court)) and instead consider the merits of the argument.

16

¶ 45     Under the Act, an arbitrator may not award attorney fees unless the agreement to arbitrate authorizes it. 710 ILCS 5/10 (West 2018). The arbitrators did not explain the basis for their award of attorney fees but merely included it in their award calculations. We have already concluded, as discussed above, that one reasonable interpretation of the Master Agreement is that Article 15 remedies, which included attorney fees, were available to Power—with or without a termination for cause—because Michels breached its duties under Article 9B. In addition, as Power correctly notes, Article 15 also stated that its remedies were "in addition to every other remedy provided hereunder under the Contract and at law and equity." And Article 7 also provided for the payment of attorney fees if a subcontractor default insurance claim arose out of Michels's work. Given all of this, we cannot say that the arbitrators' decision to award Power attorney fees and costs was grossly erroneous on its face.

¶ 46                                  IV. CONCLUSION

¶ 47     For the foregoing reasons, the judgment of the circuit court confirming the arbitration award in favor of Power is affirmed.

¶ 48     Affirmed.